In the Matter of SILAS B. AXTELL, an Attorney, Respondent.

First Department, May 2, 1930.

*Bernard Hershkopf* of counsel [*James A. Delehanty* and *Isidor J. Kresel* with him on the brief], for the petitioners.

*Edwin L. Garvin*, for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York, at a term of the Appellate Division of the Supreme Court of the State of New York, First Department, on March 15, 1910.

The petition charges that respondent has been guilty of misconduct as an attorney at law in that for many years he was engaged in the improper solicitation of retainers in personal injury cases, employing persons not members of the bar to solicit and procure retainers, and promising and giving valuable consideration for inducing persons injured to retain him; further, that respondent .advertised himself and his activities in violation of canon 27 of the Code of Professional Ethics, adopted by the American Bar Association and by the State Bar Association.

Respondent answered and the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon to this court.

After the hearings had begun before the referee supplemental charges were filed alleging misconduct by the respondent in making unfounded claims for salvage in behalf of persons not entitled thereto; in abandoning litigation instituted by him for others entitled to salvage, under circumstances amounting to a betrayal of his duty to his clients; in receiving the sum of $608.60 for one McGinnis without authority to act for McGinnis; in withholding this sum when it was demanded by McGinnis; in attempting to charge McGinnis a fee for services without having been retained by McGinnis; in tendering to McGinnis the sum of $405.73 as full payment, and withholding from McGinnis the moneys due to him, under circumstances constituting conversion thereof by respondent; in having received for Richard Pagel $411.25, and in keeping out of said sum for his own use $236.25, remitting only the sum of $175 to the relatives of said Pagel.

The learned referee has duly reported and petitioners now move that respondent be adjudged guilty of professional misconduct as charged in the petition and for such further action as the court may deem proper.

While completing his law studies, respondent served as a clerk with the Seamen's Branch of the Legal Aid Society. Following his admission to the bar he was in charge of the Seamen's Branch of that society from 1910 to 1916, when he entered practice for himself. The natural result of his experience with the Legal Aid Society was his specializing in a practice having to do with seamen. He was employed as attorney for sailors' associations and was on regular retainer for different seamen's unions. These organizations were the source of considerable business for respondent. There is testimony that officers thereof were active in the recommendation of cases to respondent. There is also testimony that union representatives were using their union connections as a cloak under cover of which to pursue investigations on behalf of respondent in some of his cases. These union agents rendered services for respondent looking up witnesses, procuring their attendance in court, making surveys, getting statements from witnesses and looking after other details in the preparation of cases for trial. Respondent made numerous payments to these union agents, but there is a stipulation in the record covering these payments, which reads as follows: " It is stipu'ated that each of the respective union agents who are shown by the evidence to have received from time to time checks of the respondent, will, if called as a witness, testify that

he was never employed by respondent to solicit retainers and that he never received or was promised any money or thing of value from the respondent as an inducement for referring or for having referred any case to the respondent; that he received from the respondent money only in compensation for services rendered, or in refund of money actually expended in looking up evidence or witnesses or procuring the attendance of witnesses or parties upon hearings or for examination by the respondent in the preparation of cases for trial, or in refund of money advanced by him at respondent's request to persons already clients of respondent, or in refund of expenses or disburse: .ents by hi⌐ in procuring shipping articles, making surveys or other necessary expenses; and that any money paid by him for such services was reasonable in amount."

In addition to serving as attorney and counsel for unions of seafaring men respondent organized the Seafarers' Thrift and Protective Co-operation. Respondent says this was a *bona fide* organization created for a truly altruistic and beneficial purpose with the hope of inducing seamen to be thrifty by saving a certain sum each week. He was its counsel and vice-president. He furnished it with funds, an office, and his employees to be its officials. That this organization was intended entirely for the betterment of seamen is doubtful. It is clear that respondent made use of it as a medium for contact with prospective clients. It is also clear that this organization as well as the seamen's union served as sources through which respondent obtained information concerning accidents in connection with the operation of ships. Respondent's activities following the receipt of such information are described at length in the record. As part of the paraphernalia of its emissaries and agents they wore a badge suggested by respondent, carrying the title " Patrolman," with an eagle and the seal of the State of New York, bearing some resemblance to a police officer's badge, which would have been quite effective if used to impress seamen from whom respondent's agents wanted to get information about accidents on their ship, but the efficiency of which as a means of preaching a gospel of thrift among them is not indicated.

On October 5, 1926, the steamship *Hybert* was in dry dock at Norfolk, Va.; a life boat was swung over the side and in it were Third Mate Barford, Able Seamen Cook and McFarland; the life boat dropped at one end, the three men in it were precipitated to the bottom of the dock and suffered injuries from which they died. One Captain Milliken of the Neptune Association notified respondent of the accident, and respondent testified that in the belief that Cook was a member of the Neptune Association (which was a masters', mates' and pilots' organization), Milliken requested

respondent to investigate the case. It was proven that Cook was not a member of the Neptune Association. Under date of October 21, 1926, respondent wrote to a friend of his, a Mrs. Eva Haller, in Pittsburgh, as follows: " There was a serious accident at Norfolk, Virginia, to three men employed on a vessel. Some gear let go and three of them were killed. We are acting for certain other attorneys who represent two of these estates, and it occurred to me that you might be able to get in touch with the widow of this one. His name is William H. Cook, Jr., 441 North Fanny Street, McDonald, Pa. This is about twenty miles from Pittsburgh. If she has a local attorney already, then he should get in touch with me. I cannot very well communicate directly with her, but if you can find any means of doing it, it will be doing her a great favor. I presume she is poor; most wives of such men are.

" It is a clear case of liability and I think that we can recover something like $20,000 or $25,000 for her, if she acts quickly. The accident occurred on the Steamship Hybert on October 15th, 1926, at Norfolk, Va."

Under date of October 22, 1926, respondent wrote to Cook's father. This letter is beyond question a solicitation of a retainer, and in it respondent does not hesitate to capitalize his union connections. October twenty-seventh there is another letter to Cook's father, urging respondent's retention, and under the same date a letter to one James W. Hamilton, whom respondent named as reference. Further correspondence was had with Cook's attorney in Washington. It was not until January, 1927, that respondent was actually retained, and the correspondence, particularly respondent's letter under date of December 17, 1926, negatives any idea that respondent had the right to believe that he could act as the Cook attorney in the matter prior to January, 1927. His retainer in this case is the result of direct solicitation on his part.

Through one Henry Bowden, in Norfolk, respondent sought a retainer in the Barford claim, and his night letter to Bowden intimates that he had the other two claims. Local counsel, however, was retained in this claim.

Respondent's efforts to secure a retainer in the McFarland claim were not as direct as in the Cook or Barford cases. Respondent had in his employ a young woman named Dorothy Cowan. The record shows that prior to October 21, 1926, Miss Cowan called Mrs. McFarland, who lived in New Haven, Conn., on the long distance telephone, and spoke with Mrs. Leacroft, a sister of young McFarland, one of the victims of the Norfolk accident. Following this telephone talk, Mrs. Leacroft met Miss Cowan

at the Hotel Biltmore in New York, during which Miss Cowan, to quote Mrs. Leacroft, " spoke of the death of my brother and of the tragedy of it, and that she knew that Mr. Axtell was terribly interested in taking care of the case, and also that they had had detectives in Norfolk at the time of the accident and that they knew it was faulty gear or faulty rope, * * *." An appointment was made to have Miss Cowan go to New Haven, but before the date fixed for the appointment she telegraphed her inability to keep it. She also furnished the McFarland family with a copy of the minutes of the coroner's inquest; this was respondent's only copy and later Miss Cowan requested its return, under respondent's direction. Miss Cowan praised respondent and urged his retention by the McFarland family, carefully concealing her connection with him and conveying the impression that she was connected with the Neptune Association. Respondent repudiates her efforts, saying she communicated with the McFarland family without his knowledge, but the exhibits indicate knowledge and approval on his part. In addition to what Miss Cowan was doing to secure this case for respondent, one Oscar Carlson called at the home of the McFarland family in New Haven, Conn., urging that they get in touch with respondent immediately regarding the case, and William Morin also called and was referred to the male member of the family at his office. Morin called there urging the retention of respondent. Respondent denies sending Carlson, but admits writing Morin to call on them to find out what they were going to do. In all of these efforts to secure a retainer in the McFarland case there was the suggestion that respondent had already been retained to represent the claimants in the two companion cases, which, while it might be helpful in persuading co-operation, was contrary to the fact. Likewise, in seeking retainers from the Cook and Barford claimants, there was the same untruthful suggestion.

Solicitation was established in the three cases growing out of the steamship *Hybert* accident. We are not swayed by respondent's disavowal of knowledge of the conduct of Miss Cowan, Carlson and Morin. The exhibits outweigh his denials in the Cook and Barford cases.

In the Hogan case, the letter sent to Hogan is a solicitation. Respondent says it was sent by a boy employed in his office, without his authorization. Information concerning this accident was given respondent's office by one Adolf Kyle, a union representative. Testimony was offered to show that Hogan had requested Kyle to communicate with the union lawyer. That would seem to excuse respondent's intervention in the case.

In the Dunn case, another instance of a union representative

reporting an accident to respondent, the explanation is that Dunn had requested, through the union agent, that respondent take up the case.

One Thomas C. See was injured on the steamship *Liberator* and died as the result of such injuries on April 21, 1927. Information concerning the accident was sent to respondent's office by a member of the Neptune Association. In May, 1927, respondent wrote See's mother a letter, from which the following is quoted:

" DEAR MADAM.— Your boy Thomas C. See, died in the Methodist Episcopal Hospital in Brooklyn on April 21st. He signed articles as deck boy at $25 per month on March 7th. The members of the Sailors' union for whom I am attorney have reported to me certain facts that make it seem to be my duty to let you know that you had a good and meritorious cause of action. If you will sign the enclosed retainer agreement I will take the case up with the understanding that you will receive 60% of the amount recovered from the claim free of all lawyers fees and expenses. It will not cost you anything to go ahead.

" * * * I am General Counsel to practically all of the organized Maritime Workers' Unions of the United States and Europe. We are anticipating that you will desire to take advantage of this offer and because of my relationship to the Union and its agent here I am causing my agents to gather the necessary testimony or statements of witnesses which will be on hand by the time your authority reaches me." /

Respondent was thereafter retained. The letter speaks for itself. His brief states: " This letter was either written by Mr. Axtell or Mr. Slafer, his assistant, and signed by Mr. Axtell along with many others without a careful perusal of its contents. * * * It is quite unnecessary to add that Mr. Axtell is no longer and will not hereafter be careless in signing letters."

One Richard Knuth was injured on the steamship *George Washington* on May 16, 1927, and died as a result thereof. Respondent wrote the following letter to Knuth's widow in Germany under date of May 25th, 1927:

" DEAR MADAM.— Your husband, Richard Knuth, was killed on the s/s *George Washington* on May 16th, as you probably know, by falling in an open and unguarded airway, and I believe a substantial recovery can be made for you. As attorney for the organized maritime workers in the United States, and by reference for the seamen's unions of Germany and for the German Consul General of this City, I am instructed to look after your husband's interests. Will you please therefore sign the enclosed authorization

at point marked ' X.' Fill out below the names and ages of any children, the date of your marriage, *et cetera*. We agree that you shall receive at least sixty per cent of any recovery, clear of all fees and expenses. In other words, our fees and expenses will come out of the forty per cent.

" You will probably receive some communication from the German Consul at this port, advising you to give me authority to go ahead with this claim. We have interviewed the witnesses who reside in the United States, and upon the return of the ship to this port will get the statements of the other seamen on this ship who knew of your husband's employment there.

" Please accept this expression of my personal regret at your great loss, and I assure you this office will do all it can to help and protect you in the matter.

" Very truly yours,

" (Signed)     S. B. AXTELL

" *Attorney for Organized Maritime Labor*
*Organizations in the United States.*

" P. S.   Mr. Franz Kohler, Secretary of the ' Schiffahrt Section of the Allgemeine Transport Arbeiters Verband, Schaarmarkt 12, Hamburg,' will give you such information concerning me professionally as you may care to have."

Respondent's brief says of this letter: " The letter came to Mr. Axtell's desk for signature and was signed along with fifty or sixty others, after a hurried reading by respondent." It is claimed the case was referred to respondent by the German Consul in New York. This letter is nothing but a solicitation of a retainer. There is no statement in the letter that respondent had been requested by the Consul to act. He was afterwards requested by the German Consul to proceed no further in the matter.

Respondent had contact with the Spanish Consulate in New York. The record contains testimony relating to two cases which respondent claims came to him on the recommendation of that office. The first, the Castro case, would seem to be governed by the stipulation in the record which reads as follows: " It is mutually stipulated that B. Llano, Secretary to the Consulate General for Spain in New York City would, if called as a witness, testify that on or before March 5, 1927, one Pedro Sanchez came to the Consulate for Spain in New York City and gave to the Consulate information concerning the injury to Jose Castro on board the steamship *Munargo* and asked the Consulate to get a lawyer for said Castro; and that he, Llano, communicated with the respondent

concerning the accident before receiving any communication from the respondent in respect thereof."

The record contains testimony concerning respondent's efforts to have Castro retain him, and the co-operation of the Consulate in such efforts, which were unsuccessful as Castro felt able to take care of his own affairs. We appreciate the natural interest of foreign consulates in the welfare of subjects of their governments, but think respondent's persistent pursuit of Castro was actuated by a desire for a retainer. The second case, information concerning which respondent attributes to the Spanish Consulate, is the Fontan case. Juan Fontan was injured on board the steamship *Munamur* on August 9, 1922, and later died from the injuries sustained. Respondent communicated with Fontan's mother. A reading of that communication, under date August 29, 1922, discloses that respondent might have been intervening at the suggestion of the Spanish Consulate. In this instance all suspicion would have been avoided if respondent had communicated with the mother through the Consul and not direct.

One Le Roy Dominy was injured on the steamship *Chetopa* and died as a result thereof. His mother wrote to the Eastern and Gulf Sailors' Association under date of October 29, 1926, asking for help. Her inquiry was referred to the Marine Firemen's, Oilers and Watertenders' Union, and under date of November fourth, Oscar Carlson, the local secretary, wrote Mrs. Dominy advising that her son was not a member in good standing and not entitled to any benefit from that organization. He added: " As your son met with this accident on board the vessel, his death might have resulted from neglect, where owners of the S. S. *Chetopa* can be held responsible. I, therefore, recommend you take this case up with Mr. S. B. Axtell the Attorney representing all organizations in New York (Seamen's Organization) as Mr. Axtell is the most able Attorney on the Atlantic Sea board in cases of this kind."

Under date of November second respondent had wired the mother: " Please forward full particulars concerning your son's death if you desire me to act in your interest and investigate circumstances and obtain settlement, etc.," signing himself " S. B. Axtell General Counsel Marine Firemans Union Atlantic Gulf." And under date of November eleventh he wrote her: " I have your letter of November 8th, advising that you have retained Counsel. Perhaps I can be of assistance to you. I would suggest that you give me his name and address. If he is some local attorney, I am quite sure he will find great difficulty in getting any adequate settlement for you without assistance.

"As Attorney for the Unions, I have corresponding attorneys and union agents, union delegates, etc., who aid the relatives of deceased members in any ports, and it is one of my functions to render such assistance to attorneys who were retained by the relatives.

"You may turn this letter over to your attorney and to make such proper reply as it deserves.

"Very truly yours,

"S. B. AXTELL."

It is interesting to note that the exhibits in this case show that there was some question as to which of the union representatives should receive credit for bringing this case to respondent's attention. Nothing in Mrs. Dominy's letter can be construed as a request to have an attorney communicate with her.

In December, 1925, the houseboat *Miramar* was sunk while *en route* from New York to Florida and all on board perished. Respondent was retained by the widows of some of the drowned men. Mrs. Thomas Farrington, the widow of the captain, was approached by respondent under date of March 6, 1926, when he wrote: "The enclosed form of contract is the same as I have with the other ladies who had suffered loss by the sinking of the *Miramar*. We want to help you to recover and to place the blame where it belongs. If agreeable, you will please sign the enclosed retainer form, and fill out the information as to the ages of the children, date of marriage, earnings of deceased, etc. Deliver this together with whatever letters or telegrams you have touching upon it, and they will be carefully preserved or returned to you.

"If you will call on Mr. S. Whalen, 6 Beacon Street, Boston, he will arrange to have you appointed as administratrix of your husband's estate, without expense to you."

Under date of April 29, 1926, Whalen wrote respondent a letter from which the following are quotations: "I have not written you anything in the matter since receiving yours of April 9th, as I have been endeavoring to get the case.

"I will do all I can of course to land the case, but we will have to bide our time for a while."

Mrs. Farrington was supposed to be in possession of communications from her husband which would indicate that the houseboat was not in condition to make the trip. Respondent caused a subpœna to be issued directed to Mrs. Farrington in Cambridge, Mass., calling for her appearance in the United States District Court, Southern District of New York. There is a stipulation in the record that respondent knew this subpœna was without force and

effect beyond 100 miles from the post-office building, New York city. Respondent wrote Mrs. Farrington under date of April twenty-seventh: " You have no doubt been subpœnaed by this time to come to New York and produce the correspondence between yourself and your husband and any copy of correspondence or instructions that you have from Mr. Statler to your husband. * * * If you would please call upon Mr. Sylvester Whalen, 6 Beacon Street, Boston, Mass., and arrange to deliver over to him the letters, it would be very helpful, and would avoid the necessity of calling you as a witness."

The abuse of process described might well be calculated to coerce a retainer, but it failed. Mrs. Farrington retained local counsel. Respondent testified that when he wrote Mrs. Farrington, he was under the impression that she was willing to co-operate with the others in the case. The efforts of respondent and his correspondent Whalen were directed toward securing a retainer, and his letter to Mrs. Farrington's local attorney, in which he states, " I do not care to handle Mrs. Farrington's case. I never did want to handle the case," is absurd in view of those efforts. He explains that letter as " his rather petulant method of telling her that after he became acquainted with the fact that she was suppressing evidence and her attitude had changed and she had become hostile to the other widows, he could not represent her in good faith to his other clients."

A number of other cases were inquired into, but the proof respecting solicitation in such cases was not so clear. Many instances of the close co-operation between union agents and respondent were developed. One case, the Krause case, shows a retainer obtained by a union agent before the death of the injured man, and then, following his death, respondent communicated with his relatives soliciting his continuance as attorney in the case. On a few rare occasions it was developed that the injured person requested that the union agent procure an attorney. In most instances, however, the union agent was really acting as respondent's agent, gathering information concerning cases which respondent might solicit.

We think enough has been shown to establish that respondent was regularly engaged in the solicitation of retainers from seamen and their relatives. Even respondent recognizes the weight of evidence against him, for his brief states: " Obviously, if some attorney with no fellowship with seamen and their unions and officials, and no record of interest in and devoted service to them, without authority, had written some of the letters to seamen or their dependents such as respondent wrote in a few cases, such

an attorney might be fairly charged with violating the rules of ethical conduct; but here, we submit, respondent's relationship to the seamen is the crux of the matter and that this conduct has been entirely professional and should be commended by this Court. His acts have not been solicitation. They have not been done with a desire of obtaining pecuniary reimbursement. Each and every initial move on his part has been with a desire to help his seamen friends and obtain justice for them as only he could do." This argument might have some weight if his efforts to secure retainers in this way had been really unselfish and altruistic and not merely a cover, as they were, for a persistent, continual and aggressive campaign for pecuniary gain.

There is testimony in the record that respondent maintained at different times a camp at Annadale, Staten Island; that he had a house at Dongan Hills, Staten Island, one at Richmond Road, Staten Island, and a farm at Little Britain, N. Y.; that he housed and maintained his clients there pending determination of their litigation; that he assisted others in the form of advances of money for board, and sometimes for lodging; that he may have taken care of more than a hundred clients, providing them with a home while their cases were pending. Respondent testified that all this was philanthropy. In the absence of proof that this maintenance was promised as an inducement to secure respondent's employment to prosecute the claims, we cannot hold that the maintenance was improper, though we entertain strong doubts of its disinterestedness.

The record as to the salvage cases shows that in the "Princeton-Ardmore" claim, respondent represented part of the crew of the steamship *Princeton* and collected the claim. After the money had been obtained by respondent, Joseph J. McGinnis, the chief engineer, insisted that respondent turn over to him his share without any deduction for respondent's fee as demanded by respondent. McGinnis' employer's counsel intervened and McGinnis made affidavit that he never authorized any one to have him joined in the representative action which respondent brought, whereupon respondent paid McGinnis in full. Respondent's story is that most of the members of the crew came to his office and informed him that all of the crew and the officers, including McGinnis, wished to be joined. According to respondent's testimony the practice is to bring an action in the name of one or more named plaintiffs. While it is true that McGinnis profited as the result of respondent's efforts on behalf of those who actually retained him, we think respondent's attempt to exact a fee from one who had not actually retained him was highly unprofessional.

Another of the crew of the steamship *Princeton* was one Richard

Pagel. Out of the award he was entitled to $411.25. When the money was collected Pagel was dead. Respondent learned this in 1922. Funds belonging to Pagel had already come into the hands of the public administrator in Kings county, as administrator of the estate. Pagel's share could have been paid to that public administrator, or if there was any question about it, to the Alien Property Custodian, or even the Shipping Commissioner. One hundred and seventy-five dollars was sent by respondent to Pagel's mother in Germany. Then the case was marked off respondent's books, respondent testifying that the bookkeeper mistakenly assumed that the money sent to Germany was in full settlement. When this investigation disclosed what had happened, respondent turned over to the German Consul for Pagel's mother ninety dollars, making his payment to her, he testified, sixty per cent of the amount collected plus twenty dollars. He attributes this situation solely to the bookkeeper. We think an attorney careful to account for moneys received on behalf of a client would have promptly turned the amount due over to the one legally entitled to it, i. e., the public administrator, who had been appointed in this estate.

In the Muskogee-Shabonee salvage case, the record discloses that these two vessels were owned by allied interests. The majority of the crew of the *Muskogee* accepted the award made for salvaging the *Shabonee*. Respondent filed a libel on behalf of certain members of the crew, in which he charged among other things a conspiracy to pay the crew an inadequate and unfair amount. Respondent relies on a communication from one Brown, a union agent, for his right to appear as attorney for such crew members. A number of them repudiated respondent and denied their retention of him. After considerable correspondence between respondent and the attorneys for the owners of the vessels, respondent wrote the attorneys a letter in which he said: " If there is anything I hate to do, it's give up a thing I have undertaken. However, this bunch of seamen have double-crossed me, at least some of them have, to such an extent that I do not feel like risking prosecution of the case any further. * * * Send me a check for the total amount ($1513.42) and I will give you a release executed on behalf of all of them and furthermore, will furnish additional release by each man as he is paid, if required. You may inspect the Powers of Attorney and retainer I have here. * * * I still think I could win this case, but due to the other things I have to do, I do not think it is worth while to fight such well-equipped adversaries."

The petitioners' charge is that respondent abandoned this litiga-

tion " for reasons personal to himself and constituting a gross betrayal of his professional duty to his clients."

Respondent's explanation is that the men he represented were of various nationalities; they became destitute and in need and asked him for money and assistance; he could not hold them together any longer for a long battle in the courts; they wanted their money and they demanded it, and the case was settled; that he told them of the offer and they said to take it.

Although respondent's letter does not indicate that his compromise of the matter was the result of any authority from his clients, in view of his testimony it would seem that the matter is not as serious as a reading of the letter might indicate.

On the charge of self-advertising, which is the only charge the learned referee sustained, the record discloses that in the *Seamen's Journal*, published by the Seamen's Union, under the heading " Current Legal Notes," accounts of cases handled by respondent were published with his name as the attorney handling the cases. These accounts were prepared and sent to the paper by respondent. There is testimony that respondent had not requested that his name be published in these articles. In the June, 1926, issue of the *Seamen's Journal*, under the heading " Information Wanted," the following notice appears: " Mariners who have filed claims for injuries growing out of damage to neutral vessels during the war, and whose claims may be approved by the Mixed Claims Commission will have a good chance to get the moneys due them if the bill now pending in the House of Representatives is passed. All persons interested who have not yet filed proof in their claims should do so now by writing to Silas B. Axtell, 11 Moore Street, New York City."

It is admitted that this came from respondent's office and was printed as an advertisement instead of a mere unsigned notice. Respondent's brief states: " Most assuredly, Mr. Axtell should not have allowed this to happen [referring to his account of how the notice came to be inserted]. * * * Respondent's greatest fault has been a laxity in his office management, but it is apparent that respondent did not intend this notice to appear as an advertisement."

A series of articles were written by respondent and published in the *Nautical Gazette* and in many of them the fact that respondent handled the case discussed is referred to.

In the May, 1926, issue of the *Seamen's Journal*, under the heading " Adequate Damages," the following appears: " What constitutes adequate damages for personal injuries to seamen in the course of employment is indicated by the following cases which Attorney Silas B. Axtell has handled or tried at New York during

the past few years," and there follows a list of some thirty-six cases covering the period from 1914 to 1926, describing the injury and the amount received in settlement. This is undisguised advertising.

Respondent had prepared and circulated a paper called *Windlass*, supposedly the publication of the Seafarers' Thrift and Protective Co-Operation, Inc. The second issue of this paper carries a photograph of respondent's office staff, four photographs of his office, refers to respondent's establishment as " The House of Axtell " and under the heading " A Proctor's Progress " there is a glorifying biography of respondent. This paper is a cheap, degrading appeal for business. Respondent said of it: " It speaks for itself; it is utterly repugnant; it is a thing any lawyer ought to be ashamed to have go out and have any connection with it and I certainly would not allow it to be used." But he directed that it be sent to the chief of the Medical Social Service, the Red Cross Society and marine hospitals. Respondent attempts to escape responsibility for the preparation of the second issue of the *Windlass* by saying he did not know what it contained until after it was printed. The record does not sustain him in this.

In the July, 1926, issue of the *Seamen's Journal* there is an advertisement, conspicuously spaced, which reads: " Announcement to Lake Seamen. Silas B. Axtell has opened an office at Room 814, Engineers Building, Cleveland, Ohio. Telephone No. Main 3668." He also had an office in Baltimore. His testimony is that he was endeavoring to break into the lake business and that the unions asked him to open an office in Cleveland. He saw the Cleveland office once. He never saw the Baltimore office. According to his own testimony, what he really was doing was farming out his reputation to the attorneys in those States whom he had associated with him.

During the Ambulance Chasing Investigation and while respondent was called to submit to examination before Mr. Justice WASSER- VOGEL, letters were addressed to that judge by the Marine Firemen's, Oilers' and Watertenders' Union, the Eastern and Gulf Sailors' Assn., Inc., and the Associated Marine Workers, all dated April 9, 1928, objecting to the investigation of the affairs of respondent so far as they related to any transactions he had had with those organizations. It is the contention of the petitioners that respondent was the instigator of this concerted effort to stop the investigation so far as he was concerned. It does appear that respondent sent a memorandum to these unions which resulted in the letters being sent. Respondent testified: " I had in mind this I. W. W. communist business and the fact that probably everything that was

said up there or produced would be peddled out by them to the union men on South Street and might be damaging, because my books did show that I had loaned money to Carlson and that I had paid various sums to various union agents and delegates throughout the United States; and I thought that would be misinterpreted and misunderstood, just as my honorable prosecutor has done." It is clear that respondent was the author of this attempt to interfere with the investigation, in direct violation of his duty, as an officer of the court, to do everything in his power to aid it.

Throughout the record there is an effort by respondent to escape responsibility for particularly bold unprofessional conduct, evidenced in some of the letters and in the Pagel incident, by testifying that some one in his office was the guilty one. We know of no rule which exempts a lawyer as principal from responsibility for the conduct of his agent; in fact, the rule has greater applicability to a member of the bar answerable for the conduct of his office. The duty rests on him to see that every one connected with his office shall reflect no discredit upon him as a member of the profession and an officer of the court. Certainly, as soon as he discovers unlawful practices going on in his office, he cannot keep the guilty parties in his employ, close his eyes as to their proceedings, trust to luck that they will not be discovered and then seek to evade responsibility for their conduct. This testimony that some one else in his employ was responsible for such extensive and long-continued unprofessional acts as those hereinbefore set forth is a confession of guilt on his part.

We are convinced from this record that respondent has violated the Canons of Professional Ethics by soliciting retainers in personal injury cases and by advertising. We are reluctant to believe that respondent was guilty of withholding funds in the Pagel case, and accept the explanation that it was due to clerical carelessness. His conduct in the salvage cases claiming to represent members of the crews on the mere statement of some one else is highly unprofessional. The attempt to interfere with the orderly procedure of the investigation into the ambulance chasing evil, ordered by this court, is reprehensible. Taking the most charitable view of respondent's professional conduct, he has been impressed with an exaggerated view of his importance which has led him to think he was authorized to do things which in an ordinary practitioner would have been regarded as highly improper. To some extent he may have been misled by the number of seamen's organizations he represented into the belief that he had some official status which put him in a privileged class and allowed him to disregard so many

ethical rules. But his solicitation of business was brazen in its effrontery and his self-glorification in print of his professional ability was nauseating. Conceding that he represented a class of migratory litigants, with whom he had to act quickly to get as clients at all, that does not excuse the methods he adopted to attract them to his office. Conceding that he was really zealous to help a class of poor and friendless seafarers to obtain redress for injuries done them, that does not palliate his breach of professional ethics in following them up and soliciting their claims with a tenacity worthy of a better cause, but always accompanied by a care to see that retainers were signed in his favor. Making every allowance for respondent's undoubted ability and earnestness we think he has pursued these practices too long and too often to escape punishment for his continued violations of the ethical requirements of his profession.

The respondent should be disbarred.

McAvoy, Martin and Sherman, JJ., concur; O'Malley, J., takes no part in the decision, as in his opinion he is disqualified.

Respondent disbarred.