In the Matter of QUINTO J. PORCELLA, an Attorney, Respondent.

First Department, June 8, 1934.

*Chandler Bennitt* of counsel [*George R. Adams*, attorney], for the petitioner.

*H. S. & C. G. Bachrach*, for the respondent.

FINCH, P. J. This is a motion made in behalf of the New York County Lawyers' Association, petitioner, for the action of this court in connection with the report of a referee, in a disciplinary proceeding concerning respondent who was admitted as an attorney and counselor at law in the Appellate Division of the Supreme Court, Second Department, on March 4, 1914.

Respondent having been retained by Mrs. Drako to attend to the administration of the estate of her deceased husband, received $500 belonging to this estate from the mutual aid society on June 23, 1930. Immediately he disbursed the same as follows: $200 for his fee, concerning which there is no complaint; $147 for Mrs. Drako; for the balance, namely, $152.25, respondent claims to have drawn a check to the order of Duncan, Klupt & Bruckhausen, attorneys for the mortgagee, to pay the interest on the mortgage on the home of Mrs. Drako. The respondent testified that he delivered the latter check to the telephone operator of the aforesaid attorneys. This check, however, was never received by the attorneys and was never cashed. Because of the failure to receive payment of the interest on the mortgage, the attorneys for the mortgagee, on June 29, 1930, or a few days thereafter, instituted an action to foreclose the mortgage. Respondent claimed this was the first intimation he had that the check had not been received by the attorneys for the mortgagee. Respondent, however, made no attempt to check over his canceled vouchers to ascertain whether the check had been paid, nor did he respond to a letter from the attorneys for the mortgagee stating that if they had erred in the statement in the complaint that the interest was in default, they would be glad to be corrected. Respondent denied receiving this letter, notwithstanding it was sent by registered mail and receipted for by an employee of respondent. Almost two years later, namely, in February, 1932, respondent paid the interest and the costs of the foreclosure action.

The referee has found that the charges against the respondent have not been established in so far as they embrace " dishonest practice or a deliberate and intentional conversion to his own use of his client's money, but the petitioner has established that the respondent was guilty of gross negligence in the performance of the duties owed to his client and that he showed a reprehensible lack of care in protecting his client's interests and in the handling of her

funds, entrusted to his care for proper disbursement, resulting thereby in his client being subjected to peril of loss."

In addition to the findings of the learned referee, we find the facts in this record disclose a deliberate and intentional conversion to his own use of moneys intrusted to the respondent by his client. The respondent sought to excuse himself by a grandiose indifference to the handling of his own bank account and an admission that he kept it in a most negligent and slipshod manner. The difficulty with this excuse, however, is that while it does not excuse these methods it also shows that the respondent was keen enough to provide the money out of the moneys of this estate to pay the rent of his office in the substantial amount of $266.67. On the same day the respondent made the above disbursements, one of which he claims was the check for $152.25 to pay the interest on this mortgage, he at the same time drew a check for $266.67 to pay the rent of his office, so that at the end of the month of June his bank account was overdrawn $10.42, and if the check for $152.25 to pay the interest on the mortgage had in fact been drawn and delivered, as respondent claims, the act would have been futile as there were no funds in the bank to meet this check. The account also shows three overdrafts during this month of June. In addition, while the respondent was seeking labored excuses so as to make it appear that he did not know that the interest had not been paid, it is obvious that even on his own story all he had to do was to use ordinary care to check up and ascertain that payment of the interest had not been made. Respondent knew clearly the importance of paying the interest as promptly as possible. On February 6, 1930, a month after the death of the husband, respondent wrote a letter to the attorneys for the mortgagee advising them of the death of Mr. Drako and asking for their co-operation until he could collect the necessary funds to pay the interest then due. The next day the attorneys replied stating their willingness to await payment of the interest. By his letter of February eighth the respondent stated that he would pay the interest as soon as the money therefor was received. On May twenty-seventh the attorneys again wrote respondent advising him of the interest in arrears and asking for information as to payment. The respondent claims that he was not advised of the claim of non-payment until the foreclosure action was begun, and that even as late as February, 1932, or almost two years after the foreclosure proceedings were started, he still thought he had paid the interest a few days after June 23, 1930. With any sort of care he certainly must have known or should have known within a reasonable time after he examined the papers in the foreclosure action the first part of July, 1930, that a check, if he had

sent one, had gone astray or had never been delivered and that the interest had not been paid. Respondent insisted that he always thought that the records of the attorneys for the mortgagee were in error, and claims he was seeking to check these records with Mr. Bruckhausen of that firm. Obviously a speedier and more certain way of establishing the payment of the interest would have been to examine his canceled checks. This the respondent did not do. Nor did the respondent secure a transcript of his bank account until the early part of 1932, after the charges had been preferred against him by petitioner. Furthermore, the attorneys for the mortgagee wrote a letter to the respondent on July 9, 1931, in which they said an examination of their records disclosed that no interest had been paid since July 1, 1929. The respondent admits that he did not reply to this letter, nor did he come personally to the office of the attorneys for the mortgagee in response to the letter. It is obvious, as stated by the referee, that if respondent at that time still thought that the interest had been paid, he was laboring under an illusion of his own creation and he simply did not take the trouble to establish the facts and put his client in the position in which she should have been. His payment of the interest in January or February, 1932, after his client had been put to great peril of loss and after charges had been preferred against him to the petitioner, cannot excuse his failure to protect his client's interest at the time he should have acted.

On a par with the alleged excuses offered by respondent for his delay in paying the interest and his failure to take the ordinary obvious steps to establish payment if in fact it had been made by him, was the excuse that the payment of interest was of secondary importance because he believed that the commencement of the foreclosure action was an ideal solution of the problem of establishing title to the property in Mrs. Drako. He claims that by permitting the foreclosure action to go through to sale, Mrs. Drako could purchase the property and thus acquire title without the contemplated procedure of establishing a trust. Respondent testified that he so advised Mrs. Drako and, in contemplation of such a step, gave little thought to the interest problem. One insurmountable difficulty with this defense is that on July 8, 1931, a day or two after Mrs. Drako had been served with papers in the foreclosure action, she sent the following letter to respondent: " Dear Sir: I am asking you and demand that you will stop any action in the foreclosure of the property located at 1222 East 89th Street, Brooklyn, New York." There was a dispute as to the meaning of this letter. Counsel for the petitioner takes the most obvious meaning, namely, that respondent should take immediate

steps to discontinue or defend the foreclosure action. It is obvious that the way to carry out this instruction would have been the payment of the accrued interest and costs. Respondent actually did this, as noted, in January or February, 1932. The respondent insisted, however, that the letter meant that he should do nothing further in regard to the foreclosure action and permit the property to go to sale, and he admits that thereafter he did nothing in the action. Even on respondent's version of this letter, however, his duty was co-extensive with the duty he had under the version of petitioner. Respondent had received the $152.25, which had been given to him by his client, for a specific purpose. A clear obligation rested upon him either to disburse that money for the purpose for which it was given him by Mrs. Drako, or if he intended to do nothing further in the foreclosure action, as he admits, then to return the money to Mrs. Drako immediately. In addition, it nowhere appears how this widow was to raise the money necessary to pay the fees of the referee and the advertising expenses of a fore-closure suit, to say nothing of where the money was coming from to bid on the property had it gone to a forced sale. Certainly her position would have been one of serious jeopardy even if the rights of foreign heirs could be defeated if not served in the foreclosure action. Clearly this defense stands out as an afterthought to justify paying office rent with the money of this estate. As attorney for Mrs. Drako and this estate, respondent knew her condition was not such as to make possible the financing by her of the purchase of the property at foreclosure sale.

Many times this court has had occasion to emphasize the strict obligation that an attorney is under to keep separate and apart from his own funds such funds as he has received for a special pur-pose and which he holds, therefore, as a trustee. (*Matter of Babcock*, 230 App. Div. 323; *Matter of Powers*, 235 id. 382; *Matter of Menzel*, 216 id. 176.)

Credibility is strained to the breaking point by both excuses alleged by this respondent for his non-payment of interest, namely, that he delivered a check to the attorneys, and his excuse that he thought a foreclosure would help to clear up title to the property owned by this widow.

We have had occasion at times to comment on the attitude assumed by respondents during hearings before referees and have taken such attitude into consideration in connection with the extent of the punishment to be imposed. Frankness and straight-forwardness in admitting guilt where guilt exists are important as bearing on the extent of the punishment. Penitence is a starting point on the road of reformation. (*Matter of Blakesberg*, 236

App. Div. 228; *Matter of Crames*, Id. 229.)   In this case there is not a line of extenuation pleaded by respondent to the charge that he was lacking in the common honesty of a professional man to perform a simple professional service of paying over a small item admittedly received by him for a specific purpose.   His defenses are a challenge to the intelligence of any one who reads this record.

The respondent should be suspended for two years, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.

MARTIN, TOWNLEY, GLENNON and UNTERMYER, JJ., concur.

Respondent suspended for two years.