In the Matter of SILAS B. AXTELL, an Attorney, Respondent.

First Department, May 20, 1932.

*Sidney Handler* of counsel [*James A. Delehanty* with him on the brief; *Isidor J. Kresel*, attorney], for the petitioners.

*Silas B. Axtell*, in person [*George V. A. McCloskey* with him on the brief], for the respondent.

FINCH, P. J. This is an application to modify an order of disbarment pursuant to a suggestion contained in the opinion of the

Court of Appeals following an appeal by permission of that court (257 N. Y. 210).

In May, 1930, the respondent was disbarred from the practice of law by order of this court (229 App. Div. 323). Thereafter the Court of Appeals granted him permission to appeal to that court.

The decision of the Court of Appeals, while affirming the finding of guilt by this court, by implication suggested that the sentence of disbarment was too severe and that an application should be made to this court " to mitigate its rigor " because " the court that pronounced the sentence has jurisdiction exclusive of any other * * *." The *per curiam* of that court is as follows: " The acts of solicitation proved against the appellant attorney are extenuated, but not excused, by his relations to the mariners' union and to foreign consulates.

" The sentence of disbarment is a severe one, but misconduct being proved, the punishment to follow was to be determined by the Appellate Division, and is not subject to revision here (*Matter of Hawes,* 217 N. Y. 602).

" The court that pronounced the sentence has jurisdiction exclusive of any other to mitigate its rigor.

" The order should be affirmed."

Following this decision of the Court of Appeals the respondent made the present motion.

This court should not depart from its traditional policy of giving consideration to the suggestions of the Court of Appeals.

The erstwhile prosecutors, the Association of the Bar of the City of New York, the New York County Lawyers' Association and the Bronx County Bar Association are not insistent that the disbarment judgment stand but, as indicated by their counsel upon the argument, they do not oppose a reinquiry and revision by this court of its sentence. Mr. Charles C. Burlingham, who occupied the office of president of the Association of the Bar of the City of New York at the time of the prosecution of the charges, supports the present motion and has submitted a signed statement, of which the following is a portion: " I respectfully urge the court to mitigate the severity of the sentence of disbarment. I think he has suffered already a severe punishment * * *."

Since we are acting pursuant to the suggestion of the Court of Appeals, it would seem unnecessary to set forth a reconsideration of the original decision. In view, however, of the insistence of the dissenting opinion herein that the respondent should remain disbarred from the practice of the law, a brief review may not be out of place.

We are concerned wholly with the extent of the punishment to be borne by respondent. His guilt remains established. The referee who heard the evidence exonerated him from all charges except that of improper advertising. We held and still hold that he was remiss in other respects as well. His fidelity to his clients in the conduct of their causes has not been assailed.

In no other case of solicitation and advertising, unless accompanied by other reprehensible acts, has an attorney been disbarred. The greatest punishment heretofore meted out for mere solicitation has been a suspension for two years. This for the reason that until the so-called " Ambulance Chasing Investigation " solicitation and advertising had not been called particularly to the attention of the court or of the members of the bar as meriting condign punishment. The evils which that investigation revealed forced the courts to punish such infractions. In the case of respondent this court was moved by the number of the acts of solicitation and the length of time over which they had continued, to order disbarment. The Court of Appeals, in going over this record, was of the view that these acts were extenuated by the relationship of the respondent to the mariners' union and to foreign consulates, and that court suggested that, in view of those circumstances, disbarment was a punishment too severe. The Court of Appeals, however, was careful to add that such relations did not wholly excuse, thus indicating that the respondent was guilty and must receive some punishment.

In the dissenting opinion reference is made to *Matter of Becker*, *Matter of Levy*, (229 App. Div. 62; appeal dismissed, 255 N. Y. 223) and *Matter of Levy*, *Matter of Hartman* (228 App. Div. 249). In the *Becker* and *Levy* proceeding the opinion in this court makes it clear that the greater offense was the assertion by those respondents of the constitutional claim of privilege and bad faith for the purpose of hindering and impeding the so-called " Ambulance Chasing Investigation." The opinion of the Court of Appeals, dismissing the appeal because no question of constitutional law was involved, contains this statement: " Appellants were not disbarred for asserting their privilege but for asserting it in bad faith." In the *Levy* and *Hartman* proceeding, while it is true that charges of solicitation only were involved, the scale upon which it was carried on transcended any mere solicitation. The respondents admitted their guilt and the proceeding never went to a referee, and, as the opinion pointed out, " The record in this case is made up of the testimony of the respondents themselves as given in the course of the investigation before Mr. Justice WASSERVOGEL." After referring to some of such testimony, the opinion continues:

" It is unnecessary to go at further length into the details of the sordid and disgraceful methods by which the practice of what should be an honorable profession was turned into a disreputable and degrading business. For six years respondents soiled their hands by passing over money to runners, ' regular ' and ' independent contractors ' or ' free lances ' and profited by the results of their operations, which continued until the initiation of the proceedings to bring about an investigation of such practices." What would have developed upon a further and more thorough inquiry is beyond conjecture. And yet, there was not disbarment there.

We refer to those proceedings only because of the emphasis laid upon them in the dissenting opinion. It would not be helpful, and would unduly lengthen this opinion, to point out the distinguishing features which were the basis for differing results in other proceedings. Suffice it to say that where disbarment was decreed in the proceedings growing out of the " Ambulance Chasing Investigation " offenses were disclosed in addition to solicitation. In this class of cases it is particularly applicable to say that conscientious analyses show no two records alike.

The dissenting opinion likewise criticizes the staying of the order of disbarment to the extent of permitting respondent to obtain substitutions for his unhappy but innocent clients. In accordance with usual custom, when the professional life of a member of the bar is at once forever cut short by an order of disbarment, a respite is often given for the limited purpose of preventing unnecessary injury to his or her clients who would otherwise suffer without their fault for an act not connected in any way with their litigation. In the case at bar the respondent was well within this principle in that he represented an unusually dependent class of litigants, namely, seamen who were drifting, roving and voyaging from port to port. The several petitions of the respondent for extensions of time set forth those whom he had been unable to reach as yet, notwithstanding advertisements and various attempted communications for the purpose of effecting substitutions and contained the sworn statement that he had ceased to practice law except for this very limited purpose. To have refused the requests for a purpose so limited would have been to inflict unnecessary hardship and expense upon a hapless class of litigants. While these substitutions were in progress, the order of the Court of Appeals was filed October 7, 1930, granting permission to appeal to that court. Pending the outcome of that appeal the respondent would have been entitled to a much wider stay of execution of the order of this court had he applied therefor. The decision of the Court

of Appeals was handed down July 15, 1931. Thereafter this application for modification was made.

It is accordingly directed that the order of disbarment be modified so that respondent shall stand suspended for the time as already served and up to the 1st day of January, 1933.

MERRELL, McAVOY and SHERMAN, JJ., concur; MARTIN, J., dissents.

MARTIN, J. (dissenting). Silas B. Axtell, an attorney, was disbarred by an order of this court dated May 2, 1930. That order was not immediately enforced and did not become effective until January 15, 1932.

When this matter was first before this court, Presiding Justice DOWLING in a very exhaustive opinion (229 App. Div. 323) set forth in detail a number of offenses which had been proved, and which rendered disbarment necessary. That opinion was concurred in by all of the members of this court then sitting, with the exception of one, who was of the opinion that he was disqualified and, therefore, took no part in the decision.

The offenses proved against the petitioner were clearly and concisely stated and then summarized in the following language: " We are convinced from this record that respondent has violated the Canons of Professional Ethics by soliciting retainers in personal injury cases and by advertising. We are reluctant to believe that respondent was guilty of withholding funds in the Pagel case, and accept the explanation that it was due to clerical carelessness. His conduct in the salvage cases claiming to represent members of the crews on the mere statement of some one else is highly unprofessional. The attempt to interfere with the orderly procedure of the investigation into the ambulance chasing evil, ordered by this court, is reprehensible. Taking the most charitable view of respondent's professional conduct, he has been impressed with an exaggerated view of his importance which has led him to think he was authorized to do things which in an ordinary practitioner would have been regarded as highly improper. To some extent he may have been misled by the number of seamen's organizations he represented into the belief that he had some official status which put him in a privileged class and allowed him to disregard so many ethical rules. But his solicitation of business was brazen in its effrontery and his self-glorification in print of his professional ability was nauseating. Conceding that he represented a class of migratory litigants, with whom he had to act quickly to get as clients at all, that does not excuse the methods he adopted to attract them to his office. Conceding that he was really zealous to help a class of poor and friendless seafarers to obtain redress for injuries done

them, that does not palliate his breach of professional ethics in following them up and soliciting their claims with a tenacity worthy of a better cause, *but always accompanied by a care to see that retainers were signed in his favor.*"

The opinion sets forth a series of acts and findings of unprofessional conduct. After reciting the details thereof, it concludes with the following statement: " Making every allowance for respondent's undoubted ability and earnestness we think he has pursued these practices *too long* and *too often* to escape punishment for his continued violations of the ethical requirements of his profession.

" *The respondent should be disbarred.*"

An appeal from the order of disbarment was taken to the Court of Appeals, and that court (in 257 N. Y. 210) stated as follows: " The acts of solicitation *proved* against the appellant attorney are extenuated, but not excused, by his relations to the mariner's union and to foreign consulates.

" The sentence of disbarment is a severe one, but misconduct being proved, the punishment to follow was to be determined by the Appellate Division, and is not subject to revision here (*Matter of Hawes*, 217 N. Y. 602).

" The court that pronounced the sentence has jurisdiction exclusive of any other to mitigate its rigor.

" The order should be affirmed."

The brief submitted by the bar associations, in referring to the opinion of the Court of Appeals, states: " The Associations of the Bar do not accept as correct the interpretation by petitioner herein of the meaning and extent of the opinion, either in this Court or in the Court of Appeals, in respect of the conduct of petitioner found to be subject to criticism.

" The Associations of the Bar do not accept as correct the statement on page 19 of the petition, to the effect that a concession was made in the Court of Appeals that no practice of solicitation had been shown on the record. The Associations of the Bar stand upon the record and the briefs submitted to this Court and in the Court of Appeals as correctly setting forth their position in this proceeding with respect to the charges against the petitioning attorney."

When the matter was first presented to the Appellate Division, the Associations of the Bar submitted a brief depicting petitioner as a menace to the bar and demanding severe punishment. Excerpts from the brief filed at that time will give some idea of the attitude then taken.

With reference to the contention that *a regular practice of solicitation by the petitioner* was abundantly proved, the brief of

the bar associations stated as follows: " A list of specific cases solicited will be discussed *seriatim* in the following pages. That so many solicitations have been proved despite the unavailability of the respondent's principals, establishes, in the belief of the petitioner's counsel, a regular course of proceeding and indicates a general practice of which these proved cases are merely examples."

After setting forth the various cases in which solicitation was charged the brief then states: " This record establishes personal solicitation by the respondent, a gross breach of the proprieties in his relations with other lawyers, and a clear case of ' chasing ' in his behalf by union agents, with his knowledge and approval."

With respect ·to the solicitation of cases through the Seafarers Thrift and Protective Co-operation the brief of the bar associations contained the following: " Respondent· created this organization. He furnished it with all of its funds except perhaps $130 in dues. He gave it offices in which to function. His employees officered it. He directed its activities and he alone stood to profit by its operations.

" He was represented as its counsel and vice president. He sought to get the president of this organization on board vessels arriving at this port and to get for him opportunity to ascertain whether accidents had happened on board ships.

" *The preparation of a badge with the name ' Patrolman '* on it in a form which, with the eagle and the State seal, so closely resembles an ordinary police officer's badge, must have been designed to give to respondent's agents an appearance of official authority when dealing with the seamen with whom they came in contact. *It was the respondent who suggested this badge.* If the Seafarer's Society was a mere voluntary organization to preach the value of saving to seamen, it did not need this badge. If, on the other hand, it was a deliberate camouflage by means of which respondent and his agents got in touch with bodies of seamen in hospitals and elsewhere, the badge would be a very helpful adjunct. * * *

" Whether the Seafarers Society ever had any legitimate purpose, it is perfectly obvious from the record that by the spring of 1922, it was a *mere soliciting agency* for the respondent's office."

In support of the contention that one Granberg was hired to solicit business, the brief reads: " The exhibits are consistent only with a regular practice of soliciting business. The sidelights given by the text of these exhibits on the activities of the respondent and of his staff reveal the respondent clearly as a skillful man well informed in his particular branch of the law and wholly unmindful of the Canons of Ethics and of his obligations to the Courts."

As to the solicitation by the unions and the union agents the

brief says: " The respondent had built up among these Union men the idea that they could reasonably expect ' expenses ' and when the ' expenses ' did not come regularly, there was disappointment.

" Whether the *quid pro quo* be large or small, whether it be regularly paid or not, and whether it be measured by the extent of the profit to the lawyer or on some other basis the evil of stimulating litigation by rewarding men in a position to send it is established by this record.

" That the stimulation existed and that both the respondent and the payees recognized its evil aspect is demonstrated by the protest letters initiated by the respondent and written to Justice WASSERVOGEL by the individuals who had been the beneficiaries of his payments."

In dealing with the use by the petitioner of consuls, clerks to consuls and consular offices in soliciting business, the bar associations' brief emphasizes the fact that this was a part of his system. " Respondent said that he was attorney for the German Consulate. This is a repetition of what he said before Judge WASSERVOGEL. Knowing, however, that the German Consular officers could be called on the subject, he hedges and admits that he is not the official attorney of the German Consulate. What actually is the fact is that he is getting data out of the Consul's office, through Wenzel, who in turn gets money from the respondent. This working arrangement between a clerk for a consul and an officer of this Court falls plainly within the class of activities prohibited to lawyers. * * *

" In the WASSERVOGEL hearing, the respondent's attitude toward these consular suggestions is explicitly stated. When he was asked if he would solicit a case because the consulate requested it, he said: ' I don't assume that that is solicitation under these circumstances.' That he has regularly solicited business coming from this source is evident from his testimony. Such practice cannot be countenanced if proper professional standards are to be maintained."

The bar associations contended that the petitioner persistently violated section 274 of the Penal Law and maintained clients and witnesses as a means of soliciting business. The brief on this point is interesting: " The record shows that in order of time the respondent maintained a camp at Annadale, Staten Island; that he maintained a house at Dongan Hills, Staten Island; that he maintained a house at Richmond Road, Staten Island; that he maintained a farm at New Britain, New York, and that he is paying maintenance for clients in Baltimore, Philadelphia, and New York. He says that this is all philanthropy. *The record proves the contrary.* * * *

" No authority can be presented to support the wholesale business of maintenance conducted by this respondent as a part of his office overhead. The petitioners urge that the proof in this record compels the finding of fact that over a period of years there has been a maintenance of litigants by this respondent for his personal profit. * * *

" These original letters of respondent demonstrate:

" 1. That respondent was maintaining his camp as a part of his solicitation of business.

" 2. That respondent's use of the camp was currently known to his runners.

" 3. That respondent instructed his runners to offer the camp and its facilities to men as an inducement for placing or for having placed their cases in his hands.

" 4. That the underlying thought of the *camp was not philanthropy* (as respondent claims), *but sordid motives of profit.*"

It may be argued that the statements in the brief of the bar associations were arguments only. The answer is that substantially all the charges were proved and were held by this court to have been proved. *A re-examination of the record confirms that conclusion.* They are also quoted to show the attitude of the bar associations at that time. The brief of the bar associations and the opinion of this court were based on facts proved in most instances by documentary evidence and fortified by sworn testimony. Facts do not change. The documentary evidence has not changed and there does not appear to be anything additional except a new application by the petitioner.

I do not understand that the opinion of the Court of Appeals is intended to be a direction or even a suggestion to this court. It states that the acts of solicitation *proved* against the appellant attorney are *extenuated, but not excused,* by his relations to the mariners' union and to foreign consulates. The other charges which were proved are not referred to by that court. We considered these same circumstances when this case was before this court, but instead of finding that they were extenuating circumstances, we concluded that they were aggravating circumstances, for the reason that the record established that the relation of the attorney to the mariners' union and to foreign consulates was part of the system designed to make the solicitation of cases less difficult than it would otherwise have been. That the solicitation by such means was very easily accomplished is shown by the complaints of the United States Shipping Board.

It must be borne in mind that some of the above specifications for disbarment included several offenses. Mr. Axtell was not dis-

barred for one offense, but for many offenses, the number charged being so large that, instead of taking them *seriatim*, they were grouped under different headings.

Mr. Axtell was not the attorney for foreign consulates, although he so represented himself. Clerks in the various consular offices were working for the petitioner in soliciting business. This is shown by the letter he sent to Mrs. Knuth and the letter sent to Mr. Llano with respect to the case of Jose Castro.

The petitioner not only organized some of the associations referred to but held office in at least one and held himself out as counsel to the unions, falsely designating himself as *" General Counsel to practically all of the organized Maritime Workers' Unions of the United States and Europe."* The delegates of several of these unions solicited business for him and were, in many instances, paid for these services.

This court and the Court of Appeals must have realized that this attorney was constantly engaged in soliciting business, and that he conducted a well-regulated system of solicitation. On this record, that fact has been proved beyond question. The letters to the mother of Thomas C. See and to the widow of Richmond Knuth are only samples of the methods used in solicitation.

To Mrs. See he wrote:

" DEAR MADAM: Your boy, Thomas C. See, died in the Methodist Episcopal Hospital in Brooklyn, on April 21st. He signed articles as deck boy at $25 per month on March 7th. The members of the Sailor's Union for whom I am attorney have reported to me certain facts that make it seem to be my duty to let you know that you have a good and meritorious cause of action. If you will sign the enclosed retainer agreement I will take the case up with the understanding that you will receive 60% of the amount recovered from the claim free of all lawyers fees and expenses. It will not cost you anything to go ahead.

" * * * I am General Counsel to practically all of the organized Maritime Workers Unions of the United States and Europe. We are anticipating that you will desire to take advantage of this offer and because of my relationship to the Union and its agent here I am causing my agents to gather the necessary testimony or statements of witnesses which will be on hand by the time your authority reaches me."

To Mrs. Knuth he wrote:

" DEAR MADAM: Your husband, Richard Knuth, was killed on the S. S. *George Washington*, on May 16th, as you probably know, by falling in an open and unguarded airway, and I believe a substantial recovery can be made for you. As attorney for the

organized maritime workers in the United States, and by reference for the seamen's unions of Germany and for the German Consul General of this City, I am instructed to look after your husband's interests. Will you please therefore sign the enclosed authorization at point marked 'X.' Fill out below the names and ages of any children, the date of your marriage, et cetera. We agree that you shall receive at least sixty per cent of any recovery, clear of all fees and expenses. In other words, our fees and expenses will come out of the forty per cent.

" You will probably receive some communication from the German Consul at this port, advising you to give me authority to go ahead with this claim. We have interviewed the witnesses who reside in the United States, and upon the return of the ship to this port will get the statements of the other seamen on this ship who knew of your husband's employment there.

" Please accept this expression of my personal regret at your great loss, and I assure you this office will do all it can to help and protect you in the matter.

" Very truly yours,

" (Signed)   SILAS B. AXTELL

" *Attorney for Organized Maritime Labor Organizations in the United States.*

" P. S. Mr. Franz Kohler, Secretary of the ' Schiffahrt Sektion of the Allgemeine Transport Arbeiters Verband, Schaarmarkt 12, Hamburg,' will give you such information concerning me professionally as you may care to have."

Mr. Axtell's dealings with the United States Shipping Board throw light on this subject of solicitation and the extent thereof, as shown by his testimony.

"Q. * * * Well, you have cases of men all over the country have you not? A. Yes, and in Europe. Q. A great many of your clients are inmates in Marine Hospitals? A. Yes. Some of them I have never seen. Q. Maintained by the Government? A. Yes. * * * Q. Do you know that despite the warnings that were flashed from the Shipping Board to these Marine Hospitals to keep your man out of there, your man did get into the places and did solicit cases? A. No, I do not know that."

That the United States Shipping Board was the victim of such solicitation is shown by the following *telegram* dated April 28, 1927, by the United States P. & I. Agency to the Marine Hospital at Galveston, Tex.: " Reliably informed Jack Van Der Staay, employee Silas Axtell, negligence attorney New York, intends solicit claims from seamen being treated in Marine Hospital.

Van Der Staay travelling Hudson Coach, New York License 8N5903. Van Der Staay is about 6 feet 1 inch tall, thin, smooth face, deep set eyes, heavy eyebrows. His itinerary is *Marine Hospitals Norfolk, Mobile, New Orleans and Galveston.* We are endeavoring as agents of Government to protect interest of Shipping Board vessels as to seamen from these vessels being treated your hospital. Efforts of Van Der Staay apparently get retainers signed and file lawsuits against Government. Your cooperation in preventing him from soliciting claims from seamen urgently requested."

Mr. Axtell, when questioned on the subject of solicitation by John Bley, the union agent at Baltimore, said: " Q. Did you know that his soliciting cases for you got to be so bad that the Treasury Department cancelled his pass and did not permit him on the Shipping Fleet vessels? A. No, I didn't know that. I heard that— Q. You did not? A. I heard they took it away from him for a different reason. He got a photograph in the case of Lustgarden against the Shipping Board, which was instrumental in our getting a verdict, and they took it away on that account."

A letter giving a fair idea of the extent to which this practice had developed was received in evidence. It states: " We are enclosing herewith photostatic copy of a letter from Mr. Silas Blake Axtell to Mr. John Bley, 735 South Broadway, Baltimore, Maryland.

" You will note from the contents of the letter that Mr. Bley is a runner for Mr. Axtell.

" An investigator of this Agency while in Baltimore learned that Mr. Bley was a representative of the Seamen's Union and had a pass to board Shipping Board Vessels, and in his capacity as a representative of the Seamen's Union solicited claims for Mr. Axtell who is the attorney for the Seamen's Union.

" There is no doubt from a reading of the contents of Mr. Axtell's letter that Mr. Bley is engaged in such business, and it would be the recommendation of this agency that if Mr. Bley has a pass to board Shipping Board vessels, such pass be revoked."

While it is true Mr. Axtell denied knowledge of the letter which provoked the above notice, he stated that although he did not authorize it, he would not have hesitated to do so, thus accepting responsibility therefor.

The difficulties of the Shipping Board are further clearly indicated by a letter dated May 25, 1925, from the United States Shipping Board Emergency Fleet Corporation to Mr. Axtell with reference to a man named Arthur Call, which reads in part as follows: " This is the third case within the past several days on which your office has instituted suit where our office has already settled in full with the plaintiff."

In addition to the solicitation of accident cases, this lawyer resorted to the cheapest kind of advertising. The referee found him guilty of unethical conduct in so advertising. A very limited idea only of the extent and grossness of his methods may be had from reading the report of the referee on this subject. The referee said: " I find that the allegation of the petition regarding self-advertising and publicity, as set forth in Paragraph V of the petition, subdivision (d), is sustained by the evidence.

" Respondent undoubtedly resorted to self-advertising and other forms of publicity. He frequently sent to the Seamen's Journal articles which made favorable reference to cases conducted by the respondent. He sent a copy of the complaint in one of his actions to a newspaper, seeking publication. In advertisements for clients or witnesses whose whereabouts were unknown, he described himself as ' General Counsel to the Organized Steamship Workers of America.' *There was no such organization.* It is claimed on his behalf, however, that there was no intention to mislead; that this was merely a method of conveying to persons concerned that he was the counsel for several different seamen's organizations. As a matter of fact, he was the general counsel for the Seamen's Union and for the Cooks' Union, and also for the Firemen's Union. In 1921, he organized and financed for a brief period the ' Seafarers' Thrift and Protective Cooperation ' and circulated two issues of ' The Windlass,' an organ of the association, which made frequent references of a complimentary character to the professional achievements of the respondent.

" Upon the basis of the petition, the respondent's answer and the proof submitted, I find that the allegations in Paragraph V, subdivision (d), of the petition, are established."

Mr. Axtell was unable to disprove the ownership or control of the paper referred to as *The Windlass* in the face of the documentary proof. If necessary, many pages could be devoted to this subject. The second edition of that paper contained *photographs of his office and of alleged members of his office staff* and also the following statement:

" THE HOUSE OF AXTELL.

" With this number of the *Windlass* we take sincere pleasure in presenting to our readers several photographic reproductions of the various legal, medical and technical departments of Mr. Silas B. Axtell's efficiently appointed and elaborately equipped law offices, in New York, and the members of his splendidly organized and effective personnel.

" The office equipment includes a very extensive law library, established on the top floor of the Axtell Building at 9 State Street,

and marine models of nearly all types of modern craft, from an East River scow to an ocean liner. These are frequently used in court to illustrate and demonstrate, for the enlightenment of longshore juries, the practical application of maritime legal theories to actual causes in admiralty.

" In private practice Mr. Axtell believes in the practical application of the co-operative theories which he so openly and ably advocates and expounds on the public rostrum.

" The various assistants in Mr. Axtell's offices are not merely employees. They are in an actual and practical sense co-partners and active participants in the business, and enjoy a *pro rata* share in the annual profits commensurate with their respective salaries and service valuations.

" By this means Mr. Axtell has always been able to attract the most efficient office assistants obtainable, and retain them indefinitely.

" Well done, well done is a good maxim for any one to follow who wants to retain efficient and dependable help in sunshine and in storm.

" By giving each assistant a personal and financial interest in the business, Mr. Axtell has raised them to the status of co-operative partners, thereby dignifying their employment and exalting their ideals of personal worth.

" Some of these associates have been with Mr. Axtell for twelve years, and all of them have long been permanent figures in the ever-growing development of the unique admiralty firm, Axtell and others, Independent."

Mr. Axtell paid all the expenses of the publication of this paper and his editor when resigning wrote several interesting letters showing Mr. Axtell's ownership and control.

" Mr. SILAS B. AXTELL,

" 9 State St.

" N. Y. City.

" Dear Mr. AXTELL: Being convinced that I can be of no further service to you at the present time, I respectfully, though, nevertheless, regretfully, sever all personal connection or association with The Windlass or its literary makeup hereafter.

" You will please announce my retirement in the *next issue of your paper*, and, likewise, please return to my address the revised copy of my lines to the ' Seamen's Convention,' which I submitted this morning.

" I am exceedingly sorry that circumstances have compelled me to take this step, especially as I took a genuine pride in our little publication, but I could not possibly continue as matters stand without incurring an injury to my own self-respect which I could not afford.

" I wish to thank you, at the same time, for your friendly and very generous assistance on many notable occasions; and I shall keep them in mind and endeavor to make full and complete restitution for your many acts of kindness, financial or otherwise, at the earliest opportunity.

" I sincerely hope, Sir, that you will not feel offended at my abruptness in making this announcement, for it simply had to be done, I am at one of those periods in life where a man has to think quick, or go out of commission.

" My very best wishes for the Seafarers' Savings Society, The Windlass and the House of Axtell.

" Yours fraternally,

" JAMES H. WILLIAMS,

" 417 Clinton St.,

" Brooklyn."

Speaking of advertising in *The Windlass*, responsibility for which petitioner sought to disavow with his characteristic denials, he gave the following testimony: " Q. Why did you destroy or suppress the sheet?   A. It speaks for itself; it is utterly repugnant; it is a thing that any lawyer ought to be ashamed to have go out *and have any connection with it*, and I certainly would not allow it to be used."

The petitioner's knowledge of the material printed in *The Windlass* was clearly established.

The attitude of defiance of the court assumed by Mr. Axtell during the Ambulance Chasing Investigation deserves consideration. The hostility of petitioner to the investigation which was being conducted to eradicate the ambulance chasing evil was quite evident.   During the progress of the investigation this petitioner inspired letters which were sent to the justice presiding, which give some idea of his conduct with respect to the entire matter and which letters were evidently intended as veiled threats.

" ASSOCIATED MARINE WORKERS,

MASTERS, MATES, PILOTS, MARINE ENGINEERS, OILERS,

FIREMEN, DECK HANDS, COOKS AND FLOATMEN

" 119 Broad Street,

" New York.

" *April* 9th, 1928.

" Mr. Justice ISIDOR WASSERVOGEL,

" Supreme Court,

" New York County Courthouse,

" New York, N. Y.

" DEAR SIR: I herewith strenuously object *to the procedure being conducted by you into the affairs of our General Counsel, Mr. Silas B.*

*Axtell*, in so far as it relates to any transaction or transactions between this organization, its representatives and its members or its relations with Mr. Axtell and other labor unions.

" I have always understood that a transaction between a client and counsel is a private and privileged matter.

" Trusting that you will give this matter careful consideration, I am

" Yours respectfully,
" WILLIAM A. MAHER,
" *General Manager & Secretary.*"

Several other letters in substantially the same language were sent objecting to the Ambulance Chasing Investigation. The letters were evidently prepared by a lawyer and in Mr. Axtell's office.

In commenting upon these letters which were sent to Mr. Justice WASSERVOGEL, who was conducting the Ambulance Chasing Investigation, the referee said: " * * * The purpose of those three letters was to terrorize the Court and to limit or restrict the investigation that it contemplated making or was making against Mr. Axtell."

The additional charge that this attorney sought permission to have the president of one of these organizations board vessels arriving at the port of New York to ascertain whether accidents had happened during the voyage was clearly proved.

To corroborate the testimony that this attorney conducted a wholesale business of solicitation it was shown that he designed for use a badge with the State seal and the word " Patrolman " thereon, closely resembling the ordinary police officer's badge, which was evidently intended, as the bar associations' brief says, to give to his agents the appearance of official authority when dealing with seamen with whom they came in contact.

It was established that payments under the guise of expenses were made regularly to men, particularly to union delegates, who secured retainers for the petitioner.

Camps were maintained to house clients and witnesses during the pendency of litigation.

On the question of his connection with the consulates, the evidence is clear that although he represented himself as attorney for these consulates, he never was such attorney, but simply used his influence and the services of men connected with the consulates to solicit business and then compensated the men. It is difficult to understand how this *corrupting influence* could be considered a mitigating circumstance.

Within approximately one year after filing our opinion setting forth in detail the numerous offenses which this court held were

proved, we are asked to repudiate that opinion, absolve the petitioner and say that the offenses were either not proved, or, if proved, were not serious enough to warrant disbarment or any other punishment. With such a mass of condemning evidence before the court proving the charges beyond all doubt, I am unwilling to place this court in any such position.

The referee sustained one charge. This court sustained several additional charges. The Court of Appeals appears to have regarded the proof of solicitation as complete, for in the *per curiam* opinion, above quoted, the court said that " the acts of solicitation *proved* against the appellant attorney are extenuated, *but not excused*, by his relations to the mariners' union and to foreign consulates."

It is not claimed that this court erred in its findings, but we are asked by petitioner to make an exception of this case and to treat it in a manner quite different from the numerous other cases that have come before us growing out of the Ambulance Chasing Investigation in which other attorneys have been disbarred for similar practices. (*Matter of Becker, Matter of Levy*, 229 App. Div. 62; appeal dismissed, 255 N. Y. 223.)

In *Matter of Becker* and *Matter of Levy* (*supra*) this court held that it would not permit solicitation such as has been found in the case of this appellant. The headnote to the case, which summarizes the opinion, is as follows: " The respondents, attorneys at law, are disbarred for solicitation of negligence cases and for refusing to answer questions in the so-called ' Ambulance Chasing Investigation,' upon the ground that their answers might tend to incriminate them. The respondents procured an employee for the sole purpose of developing a negligence business for them and said employee and his ' runners ' developed said business through solicitation with the knowledge of the respondents.

" In the so-called ' Ambulance Chasing Investigation ' the respondents, when called as witnesses, were not entitled to refuse to answer questions upon the ground that their answers might tend to incriminate them, for their claims of privilege were fraudulent, insincere and sham. . The claim of privilege is qualified by the condition that it must be asserted in good faith.".

In *Matter of Levy* and *Matter of Hartman* (228 App. Div. 249) the headnote states the position taken by this court in cases of soliciting: " The respondents, who are attorneys at law practicing as partners, are suspended from practice for two years for soliciting negligence cases. The evidence establishes that the respondents employed runners continuously for several years to solicit negligence cases and that they procured cases from others not in their employ and paid therefor.

" The respondents would be disbarred were it not for the fact that the counsel for the petitioners joined in a plea for clemency on the ground that the respondents were among the first to come forward and testify in the general investigation of ambulance chasing and that in that investigation they made frank disclosure of the manner in which they conducted their office and gave those conducting the investigation valuable information."

Sweeping denials in the face of overwhelming proof by documentary evidence show either a failure to comprehend the facts or a reckless disregard of the truth. In the face of this record, which I have carefully read, and Mr. Axtell's experience with the United States Shipping Board, it is idle for the petitioner to say that he did not know the meaning of the term "runner," that he never solicited business and never permitted anybody to solicit business for him. A complete answer to those statements are the letters, a few only of which have been set forth herein.

He now says he was not permitted to meet that testimony on the hearings. Mr. Justice DELEHANTY, who had charge of the proceedings for the bar associations, said: " * * * It is correctly stated by the respondent that the Referee evidenced impatience at the length of the reference. The Referee, while obviously anxious to expedite the hearing, did not preclude any proof. On the contrary, the Referee carried on the hearings over a period of several months (part of the delay being due to deponent's illness) and respondent cannot soundly state that he was deprived of the opportunity to furnish evidence before the Referee."

If an attorney may defiantly continue such practices for years, and after being disbarred upon the ground that his numerous offenses were of the most serious character, by merely making a motion for reinstatement thus avoid the effect of the disbarment, all the efforts made to improve conditions at the bar will be of very little value. There may be a time when the court may reinstate, but the facts here do not warrant any such action at the present time.

In addition, the respondent herein seems to have been most fortunate during the pendency of these proceedings, for although it appears that he was disbarred, it also appears that orders have been entered from time to time by this court suspending the effect of the disbarment order *up to January 15, 1932,* so that as a practical result he has never been suspended or disbarred for one day prior to that date.

The prevailing opinion in its present form having been written since the dissenting opinion, it has become necessary to add a few words to this opinion.

It is stated in the prevailing opinion: " The decision of the Court of Appeals, while affirming the finding of guilt by this court, by implication suggested that the sentence of disbarment was too severe and that an application should be made to this court ' to mitigate its rigor * * *.' "

I do not read the *per curiam* opinion in that light. In any event, it may not be said that the Court of Appeals ever suggested the result now being reached.

It is also stated in the prevailing opinion that " The erstwhile prosecutors, the Association of the Bar of the City of New York, the New York County Lawyers' Association and the Bronx County Bar Association are not insistent that the disbarment judgment stand but, as indicated by their counsel upon the argument, they do not oppose a reinquiry and revision by this court of its sentence."

The brief submitted on this application by the Bar Associations states as follows:

" The Associations of the Bar stand upon the record and the brief submitted to this court and in the Court of Appeals as correctly setting forth their position in this proceeding with respect to the charges against the petitioning attorney."

It is also mistakenly asserted that the dissenting opinion suggests that the respondent *remain disbarred*. The only suggestion ever made in this dissenting opinion is as follows: " There may be a time when the court may reinstate, but the facts here do not warrant any such action at the present time. * * *. The order of disbarment should not at this time be modified in any particular."

The dissenting opinion at all times has insisted only upon substantial and adequate punishment for conduct *conceded* by the prevailing opinion to merit punishment.

The letter of the former president of the Association of the Bar of the City of New York states: " I respectfully urge the court to mitigate the severity of the order of disbarment. I think he has suffered already a severe punishment * * *."

This letter clearly overlooks the fact that at the time it was written, which was under date of November 12, 1931, because of the entry of various orders suspending the operation of the order of disbarment, the respondent had not in effect been suspended or disbarred for one day and had not in fact received any punishment. The letter is, therefore, based on an erroneous assumption.

When the dissenting opinion was written, the punishment then provided for in the prevailing opinion was as follows: " That the order of disbarment be modified so that respondent shall stand suspended for the time as already served."

At that time, due to the entry of orders providing that the

disbarment order should not be enforced, the respondent had not in effect been suspended or disbarred, with the result that he had escaped any punishment whatever for the offenses admitted to have been proved.

There should be no dispute as to what the cases cited in the dissenting opinion hold. (*Matter of Levy* and *Matter of Hartman, supra.*) They speak for themselves.

The assumption that soliciting and advertising were the only offenses is incorrect. Those offenses alone, on such a wholesale and reckless scale, should be sufficient, but why overlook the other findings? (1) Badges similar to those used by police officers were furnished the investigators of the respondent to impress those with whom they came in contact that they had an official status. (2) Clients and witnesses were housed, kept and fed by the respondent. (3) Money was paid to runners who were connected with unions for their services in soliciting cases. (4) Payments to clerks in consular offices to obtain business were made from time to time by the respondent. (5) Claims for salvage were filed without authority. (6) The United States Shipping Board was so annoyed by respondent and his runners that it was necessary for the Board to take official action to stop such practices, as shown by the letters in the record. (7) The attitude of defiance shown throughout the record and by the letters sent to Mr. Justice WASSERVOGEL, truly depict the contempt of the respondent for the courts in all his dealings.

The prevailing opinion has evidently overlooked these and many other matters contained in the record.

This court has been constantly reminded of the necessity of purging the bar of unworthy members by eliminating those who have proved to be unfit for membership. In view of the position taken in this case by some of those who have been loud in their demand for reform, it must be concluded that the sterling speeches made on the subject were for public consumption only. If it be true that the bar associations do not now oppose this application, they have, without any apparent reason therefor, taken a complacent attitude in the matter, which is a remarkable change from the course suggested when the proceeding was first here.

In my opinion such a course will not aid in improving conditions at our bar or inspire confidence in such prosecutions.

The order of disbarment should not at this time be modified in any particular.

Motion granted and order of disbarment modified so that the respondent shall stand suspended for the time already served and up to the 1st day of January, 1933. Settle order on notice.