In the Matter of NIALL F. O'DOHERTY, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

First Department, July 13, 1961.

*Frank H. Gordon* of counsel (*Eric Nightingale,* attorney), for petitioner.

*James W. Scott* for respondent.

*Per Curiam.* This is a disciplinary proceeding instituted against an attorney and counselor at law, under section 90 of the Judiciary Law. Under original and supplemental petitions hearings were conducted by a Referee appointed by this court. With respect to the charges contained in the original petition the Referee found respondent guilty of " technical " conversions and with respect to the charges contained in the supplemental petition found that the proof did not establish misconduct.

The Referee's report with respect to the original petition should be confirmed, except that the characterization of the alleged conversions as " technical " should not be adopted. The report with respect to the supplemental petition should not be confirmed and the charges should be, in part, sustained.

Respondent was initially charged, in effect, with having converted the funds first of one client and then repaying the converted funds from other moneys converted from a second client. He claimed at the hearing that the second client was reimbursed with borrowed funds. The claim of borrowing later became the subject of a supplemental petition charging respondent with having, in effect, converted the funds belonging to still a third group of clients. With respect to the third group, respondent had testified at the hearings on the original petition that he had received the authority of one of the clients, since deceased, to borrow the funds from two others. However, on the hearings on the supplemental petition one of the surviving clients testi-

fied that she knew of no authority having been given to lend the money to respondent and that, on the contrary, respondent had made no claim of a loan and told her that the failure to make prompt payment was due to the fact that he, respondent, was up against it, that he needed a little time, and that he would give notes for the funds involved. The other surviving client testified that his permission was not sought for the lending of the funds.

Respondent, born in 1921, was admitted to the Bar in this Department December 19, 1946. Following his admission to the Bar he was employed with at least two law firms and for a period he practiced as a sole practitioner. Since October, 1955 he has been employed. The incidents involved in the charges occurred between 1952 and 1954. Although the original petition was filed in 1955 the proceedings and the hearings extended from 1956 into 1959. The Referee's report was not filed until May 15, 1961.

In early 1952 respondent was handling the estate of one Cecilia B. Bresland. While handling the estate he misappropriated to his own use $2,200 of the funds of the estate represented by a check. The check bore the legend that it was in settlement of various hospital bills. The administratrix testified emphatically at the hearing that she did not sign the check and the minute she saw it she recognized that the purported signature was not hers. Respondent denied he had signed the administratrix' name on the check, but he was uncertain how or when the check was presented to her for signature. Although all other checks drawn on the account were forwarded by mail to the administratrix to be signed by her, this one was not.

In 1953 after the administratrix, being dissatisfied, retained another attorney, the shortage was discovered. On July 9, 1953 respondent reimbursed the estate to the extent of $1,850, and one week later paid the balance of $350.

In order to make the payments to the first client respondent appropriated $1,850 belonging to another client which he received in connection with a real estate transaction. He induced the second client to make two checks: one for $1,000 payable to the purchaser, and the other for $850 payable to herself. Although the client testified that she never authorized it, respondent testified that with the client's authorization he indorsed the names of the payees on the back of the checks, cashed them, and used the proceeds to reimburse the estate from which he had previously misappropriated funds.

In March, 1954 respondent reimbursed the second client for the funds last taken with moneys that he testified he had bor-

rowed. When he was questioned on the hearing before the Referee with respect to the borrowing his attorney at the hearings objected and the examination was largely curtailed on the ground that the matter was outside the scope of the original petition. Enough was elicited, however, to establish that the borrowings had been made from some cousin clients whose interests as distributees in still another estate were being handled by respondent.

As a result of the disclosures at the close of the hearings on the original petition, and because of the curtailment of the examination by the Referee, a supplemental petition was filed charging respondent with having, in effect, misappropriated funds of the cousin clients. Hearings were conducted on the supplemental petition.

A commission was issued in 1958 to take the deposition of one of the cousin clients in Connecticut, who could not or would not come to New York to testify. The commission was issued at the instance of petitioner Association of the Bar. The witness' testimony was not particularly illuminating but he did testify to delays in receiving his funds from respondent after the issuance and reissuance of checks by respondent that were returned after presentment. He recalled no conversation with the deceased cousin about a borrowing by respondent or that respondent himself ever asked for permission to use the funds. Notably, respondent's counsel, who was present at the taking of the deposition, did not cross-examine the witness concerning any loan or authorization for a loan by the deceased cousin client or the witness himself.

At a hearing in 1959 another surviving cousin testified that respondent had never stated to her that one of the deceased cousin clients had authorized the " borrowing " of the moneys. Nor had she knowledge of such purported authorization. Moreover, she testified that respondent had told her that the reason he had not paid over the moneys to the cousin clients was because he was hard up at the time, that he needed some additional time, and that he would give notes for the payments due.

At this last hearing respondent did not testify. Instead, he rested on the curtailed examination on the prior hearings in which he had said that he had borrowed funds from the same two cousins who had testified, that his deceased cousin client had told him he could borrow the money, and that the deceased cousin would see that the other two cousin clients were agreeable to that use.

Eventually, all of the cousin clients were paid. The one to whom the notes were given was not, however, paid until after

the supplemental charges were filed and even then payment was not made on the due dates of the notes.

As the Referee found, respondent converted the moneys of the first client and then of the second client. The diversion of funds was not merely technical in any measure but was a deliberate misuse of entrusted funds. Moreover, respondent by evasive testimony in 1956 before the Referee sought to create the impression that the misappropriations had been inadvertent. This only compounded the professional misconduct committed by him in the first instance. The effort at creating an impression of inadvertence was palpably untenable in view of the legend borne by the first check in question and the manner in which that and other checks and the check stubs were handled in respondent's personal records. Nor is the situation bettered from the point of view of respondent by the fact that he had failed to segregate client funds from his own. Of course, too, disregarding the issue as to the signing of the first client's check, the unauthorized indorsement of the checks drawn by the second client is another instance of serious professional misconduct.

Turning to the charges embraced in the supplemental petition on which the Referee found there was no misconduct, it is evident that respondent continued in a course of professional misconduct in order to overcome the consequences of his earlier acts. Moreover, the consequences of this misconduct were projected into the 1956 hearings before the Referee by respondent's testimony with respect to the alleged " borrowings ". At such hearings respondent, through counsel, made a deliberate effort to curtail the inquiry as to the source of the borrowed moneys. Only because the last effort was partially unsuccessful did it appear that respondent was relying upon an authorization attributed to a dead man. Even if granted, the alleged authorization hardly justified the use of the money since the dead man did not have authority to consent for the other cousin clients.

After testimony by the two surviving cousin clients that they knew of no loan, respondent stood silent. Nor were the witnesses cross-examined by respondent as to any " loan ". Such silence and the failure to elicit explanatory or contrary testimony permit the inference that the witnesses testified truthfully (*Matter of Wysell,* 10 A D 2d 199, 202; *Matter of Randel,* 158 N. Y. 216, 221).

That the cousin clients were eventually paid, after defaults on notes and the non-payment of checks drawn by respondent, does not eliminate, although in a proper case it may mitigate, the wrongfulness of the misappropriation (*Matter of Ellenbogen,* 3 A D 2d 237, but, see *Matter of Ellenbogen,* 7 A D 2d

390; *Matter of Sayer,* 146 App. Div. 928, 929; 5 Am. Jur., Attorneys at Law, § 271).

Consequently, in this respect the Referee's report should not be confirmed, but, on the contrary, should be rejected and the charge in the supplemental petition relating to the misappropriation of the cousin clients' funds in order to reimburse the second client whose funds were also converted should be sustained.

As to the remaining charges contained in the supplemental petition, which related to the misappropriation of additional funds belonging to the cousin clients, the evidence shows only that the clients' funds, deposited in respondent's special account, were gradually withdrawn over a period of nearly a year for unexplained purposes. The gradual and irregular withdrawals do not support respondent's contention of a loan to him. The cancelled checks, however, were not produced and the record does not affirmatively demonstrate that respondent converted the withdrawals to his own use. To such extent, therefore, the supplemental charges were not proven and should be dismissed.

Deliberate and repeated conversion of clients' funds demonstrates unfitness for one to be a member of the Bar (*Matter of Sohmer,* 3 A D 2d 89; *Matter of Young,* 284 App. Div. 406; *Matter of Berkson,* 282 App. Div. 265; *Matter of Rinaldi,* 265 App. Div. 715; *Matter of Kaplan,* 255 App. Div. 641; *Matter of Scuderi,* 237 App. Div. 589; 7 C. J. S., Attorney and Client, § 23, p. 746 *et seq.*; 5 Am. Jur., Attorneys at Law, §§ 261, 269; Drinker, Legal Ethics, pp. 46–47*). Moreover, an act of conversion cannot be thereafter converted into a loan by the fact that a note was subsequently given to the client (*Matter of Rinaldi, supra*; *Matter of Schwalb,* 262 App. Div. 482, 483; *Matter of Getz,* 256 App. Div. 194, 195; 7 C. J. S., Attorney and Client, § 25, subd. c). The giving of false testimony in disciplinary proceedings, whether before a committee on grievances or a Referee, based upon the conversion of funds, aggravates further the original professional misconduct (*Matter of Ivone,* 241 App. Div. 5). That respondent committed an act of professional misconduct only a few years after he had been admitted to the Bar may not be explained by relative inexperience where

---

*To the same effect: e.g., *Matter of Axelroad* (278 App. Div. 325); *Matter of Longo* (274 App. Div. 14); *Matter of Buchman* (271 App. Div. 670); *Matter of Shorell* (269 App. Div. 78); *Matter of Givant* (263 App. Div. 655); *Matter of Seaburg* (262 App. Div. 484). Cf., e.g., *Matter of Ellenbogen* (3 A D 2d 237, *supra*) but, see *Matter of Ellenbogen* (7 A D 2d 390, *supra*); *Matter of Markowitz* (277 App. Div. 38); *Matter of Pinckney* (276 App. Div. 700). See, also, *Matter of Militana* (8 A D 2d 348).

the acts involve conscious breach of trust and are part of systematic conduct extending over several years (5 Am. Jur., *supra,* § 261). In such circumstances the quite unfortunate but not extraordinary family difficulties that respondent had with his aged father and aged mother do not supply a sufficient excuse (*Matter of Pollane,* 230 App. Div. 318, 321; cf. *Matter of Nicolini,* 262 App. Div. 114). The yielding under such stresses, evidently involving his parents' health but not their financial status, establishes a lack of character and fitness required by one to represent clients as a lawyer.

This court has always been quick to recognize ameliorative distinctions in proceedings affecting attorneys. Greater mitigating factors, none of which is truly present here, are prompt and complete restitution prior to the bringing of disciplinary proceedings, genuine contrition, frank and complete explanation, co-operation in the proceedings — or at least the absence of obstruction, isolatedness of the transaction, long years of honorable service at the Bar, and such other factors as reveal a basically sound character and the accidental quality of the misstep which has brought the respondent to answer for his conduct (e.g., *Matter of Hahn,* 285 App. Div. 592; *Matter of Markowitz,* 277 App. Div. 38, *supra; Matter of Pinckney,* 276 App. Div. 700, *supra; Matter of Grossman,* 266 App. Div. 338; *Matter of Porcella,* 241 App. Div. 344, 348–349; *Matter of Menzel,* 203 App. Div. 515, but, see 206 App. Div. 797 and 216 App. Div. 176; cf. *Matter of Freeman,* 243 App. Div. 621 [2d Dept.]. See, also, *Matter of Hoenig,* 268 App. Div. 8). But even ameliorative distinctions must rest in reason if they are not to introduce either arbitrary inequality or hazard unduly the public interest.

It would thus appear that on the charges of the original petition, sustained by the Referee, and in the absence of sufficient mitigating factors, respondent may no longer be entrusted with the affairs or moneys of clients. In view of the findings now made with respect to the supplemental petition, and, especially, in view of respondent's lack of candor, evasive — if not, indeed, false — testimony, and his failure to co-operate in the proceedings, his unfitness is further demonstrated, and offset whatever interpretation may be placed on the delays in bringing the present proceeding to a prompt head.

It is always disagreeable for this court to discipline members of the Bar. The responsibility reaches its greatest disagreeableness when the extreme sanction of disbarment must be imposed. However, the primary responsibility of the court is the protection of the public. What was said by this court

in *Matter of Wohlfeld* (12 A D 2d 82, motion for leave to appeal denied 9 N Y 2d 612), less than a year ago,* is especially applicable to the present matter (pp. 82–83): "There appears to be no doubt that respondent's misconduct, all of which occurred during a one-year period, was due to the financial and emotional strain under which he was laboring at the time. Nevertheless, respondent was not guilty of an isolated transgression that would indicate little likelihood of recurrence, but of a course of conduct covering a one-year period. A proper regard for the protection of the public dictates that we cannot hazard the risk of future misconduct on the part of respondent if again subjected to a similar period of stress.

"The respondent should be disbarred."

Accordingly, the Referee's report with respect to the charges in the original petition should be confirmed and the charges contained therein sustained; the report of the Referee with respect to the charges contained in the supplemental petition should be, in part, rejected and the charges sustained to the extent above indicated; and the respondent should be disbarred.

McNally, J. (dissenting). I am not in accord with the majority and therefore must dissent. In my view the discipline imposed is entirely too severe.

Respondent was admitted to practice in this State in December, 1946. In this disciplinary proceeding, a Referee has found that between February 29, 1952 and March 25, 1954 respondent

---

* In the past year, in this court, in every case but one, where the respondent was found guilty of converting clients' funds, in which there were no palliative circumstances indicating that it would not be prejudicial to the public interest to permit the respondent to practice law, with or without suspension, the respondent was disbarred: *Matter of Healy* (11 A D 2d 4, appeal dismissed 8 N Y 2d 1137); *Matter of Wilkes* (11 A D 2d 35); *Matter of Greenstein* (11 A D 2d 362); *Matter of Forman* (11 A D 2d 380); *Matter of Wohlfeld* (*supra*). The exception was *Matter of Colwin* (12 A D 2d 83), where there were extenuating circumstances and the charge was the first in 36 years of law practice. In *Matter of Greenstein* (*supra*), the comments of the court are quite applicable to the situation involved in this case:

"It is true that in no case involving a check which was returned did any client or other person lose any money. Moreover, we can appreciate the tensions and disturbance which the unhappy illness of respondent's wife may have caused. But neither restitution nor illness in a family creating a climate of harassment affords an excuse for unprofessional conduct.

"In 1939 respondent was censured by this court (*Matter of Greenstein*, 258 App. Div. 32). In view of respondent's past record, the serious nature of the present charges, and his lack of forthrightness in testifying before the Committee on Grievances, and giving due consideration to all of the mitigating circumstances, we have concluded that respondent should be disbarred for his unprofessional conduct." (p. 364).

applied to his own use funds of clients who have been fully reimbursed and have accepted the explanations of respondent.

While it is true that the charges represent derelictions that cannot be overlooked, there are, however, mitigating circumstances. At the time of the acts and for a long period prior thereto, respondent was faced with the responsibility and care of his aged and serious ailing parents, and his conduct should be viewed in the light of the attending stress, financial and emotional. I am inclined to give weight to the extenuating circumstances. (See *Matter of Levin*, 9 A D 2d 532; *Matter of Strahl*, 13 A D 2d 446.)

The charges have been pending for approximately six years. During that period respondent has risen to a position of trust and confidence while bearing the impact of these proceedings.

The transgressions charged to respondent are of an isolated type that would indicate little likelihood of recurrence. A proper regard for the protection of the public would indicate that there is little hazard in the risk of future misconduct on the part of respondent. The object of disciplinary proceedings is, of course, the protection of the public and the maintenance of orderly high standards among practitioners. Disciplinary action is merely a means used in the accomplishment of this end. Where a record discloses that by his own efforts respondent has brought himself to the point of maintaining himself professionally at the desired level of standards, where his acts of misconduct have done no serious injury to others and where there has been full reparation, discipline, particularly drastic and severe discipline, serves no purpose and tends to become retaliatory rather than protective.

I am aware that discipline as a deterrent to others is wholly justifiable, but in such cases there must be a careful balancing of the benefits to others against the harm to the individual. While we must not lose sight of the fact that the justification of all discipline is the protection of society, rehabilitation is in the long run the most hopeful approach thereto. We should demonstrate an understanding of individualized treatment which means that discipline should take into effect all the factors bearing on the offender's private and professional life. It is important that the offender himself understands the basis for the imposition of discipline. Furthermore, what appears to the offender to be unequal discipline hinders his adjustment and serves no useful purpose — bearing in mind the Aristotelian admonition: "There can be no greater injustice than to treat unequal things equally."

Ultimately, no one can be improved except by himself, and the degree of individual responsibility assumed by the offender will be decisive. I am opposed in principle to the enunciation of and compulsory adherence to any rule which firmly establishes the degree of discipline in all cases involving any particular type of infraction. As is so capably pointed out in the majority opinion, this court has the power to make ameliorative distinctions in the administration of disciplinary action. This respondent has shown by his own conduct his capacity to completely rehabilitate himself and has discharged his duties to the profession, the community, himself and his family in a highly satisfactory manner. This should be sufficient to reasonably induce this court to make the ameliorative distinction which I believe is required in the administration of discipline in this proceeding. Furthermore, I believe that a spirit of mercy should attend matters of this type, especially where the respondent has a good reputation for integrity. (See *Matter of Rothbard,* 225 App. Div. 266; 237 App. Div. 846.)

For the reasons stated above, I dissent and vote to confirm the report of the Referee but feel that suspension should be the only discipline meted out in this proceeding. Such suspension, with leave to apply for reinstatement at the end of the suspension period, would well serve the ends of justice and protect the public. (See *Matter of Axtell,* 229 App. Div. 323, affd. 257 N. Y. 210; 235 App. Div. 350.)

Breitel, J. P., Stevens, Eager and Steuer concur in *Per Curiam* opinion; McNally, J., dissents in opinion.

Respondent disbarred.