**In the Matter of Ivan Stephen FISHER, Respondent.**

**No. M–2–238.**

United States District Court, S.D. New York.

Dec. 10, 2012.

## OPINION AND ORDER

P. KEVIN CASTEL, District Judge.

**BEFORE THE COMMITTEE ON GRIEVANCES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**[1]

On March 23, 2011, the Committee on Grievances for the United States District Court for the Southern District of New York (the "Committee") issued an order to show cause annexing a thirteen-page Statement of Charges against Ivan Stephen Fisher (the "Respondent"), an attorney who is a member of the Bar of this Court. The Statement of Charges set forth five charges arising out of Respondent's receipt of $250,000 from a client which was to be used as payment of restitution to the corporate victim of the client's embezzlement. It was not disputed that certain monies that had been received by Respondent had been neither paid to the victim nor returned to the client. In an Opinion and Order dated January 23, 2012, 2012 WL 206122, the Committee concluded, based upon undisputed facts, that Respondent had engaged in conduct that violated the New York Rules of Professional Conduct (the "Rules") and its predecessor, the Lawyer's Code of Professional Responsibility (the "DRs").[2] Specifically, it found that two of the charges had been established: (1) Respondent had entered into a business transaction with a client with whom the attorney had differing interests, without taking adequate steps to ensure the fairness of the transaction to the client (Rule 1.8(a); DR 5–104(A)); and (2) Respondent had failed promptly to pay or deliver to the client funds in the attorney's possession that the client is entitled to receive (Rule 1.15(c)(4); DR 9–102(C)(4)). The January 23, 2012 Opinion and Order concluded that it need not reach "at this time" the three other charges in the Statement of Charges of July 11, 2011, which included those relating to conversion of the funds and the failure to deposit the funds in escrow. (Jan. 23, 2012, Opinion and Order at 2 n.3.) The January 23 Opinion and Order suspended Respondent on an interim basis, pending a determination of final discipline.

Thereafter, Respondent moved for reargument seeking an evidentiary hearing on the two charges that the Committee found established. The Committee, in the exercise of discretion, granted Respondent an evidentiary hearing on the two charges it had reached, as well as the three unadjudicated charges. The Committee referred the matter to Magistrate Judge Henry Pitman to hear and report and continued the interim suspension in place.

Following an evidentiary hearing, Judge Pitman issued a Report and Recommendation on June 29, 2012 finding that Respon-

---

1. The members of the Committee are District Judge P. Kevin Castel, Chair; Chief Judge Loretta A. Preska; District Judges Vincent L. Briccetti, Katherine B. Forrest, Paul G. Gardephe, John F. Keenan, Colleen McMahon, Louis L. Stanton, and Richard J. Sullivan; and Magistrate Judge Frank Maas.

2. On April 1, 2009, New York Courts replaced the DRs with the Rules. The Committee reaches its decision applying the rules in effect as of the dates of Respondent's conduct.

dent violated DR 9–102(A), (B) and (C)(4) and DR 1–102(A)(4), (5) and (7). Judge Pitman found that Respondent did not violate DR 5–104(A) and Rules 1.15, 1.8(a) and 8.4(c), (d) and (h). Upon receipt of Respondent's objections, the Committee referred the matter back to Judge Pitman to consider an evidentiary objection raised by Respondent and, thereafter, Judge Pitman issued a Revised Report and Recommendation (the "R & R"). We review Judge Pitman's findings and conclusions *de novo* as to the matters raised in the timely filed objections.

The Committee adopts Judge Pitman's well-reasoned findings of fact and conclusions of law.

### DISCUSSION

Respondent represented a cooperating defendant in *United States v. Abe Rafaeil a/k/a Ebrahim Raphael a/k/a "Abe" and Shace Lulgjuraj*, S2 04 Cr. 707(KMW) (S.D.N.Y.). In advance of sentencing, the client, Raphael,[3] agreed to pay $250,000 in restitution to the victim of his embezzlement, International Gemmological Institute, Inc. ("IGI"), which was represented by Michael S. Devorkin. Respondent received $250,000 from Raphael, did not deposit it in an escrow account, spent $50,000 of the $250,000 on personal expenses and borrowed $50,000 from Raphael to replenish the depleted funds. Respondent paid $120,000 to IGI, leaving the amount of $130,000 owed to IGI and a $50,000 debt owed to Raphael. At the hearing, Respondent argued that the original $250,000 was a loan from Raphael to him and, thus, he did not convert any client funds but instead failed to repay the loan.

At the hearing, Raphael, Devorkin and James Druker, the lawyer who replaced

Respondent as Raphael's counsel in the criminal proceeding, testified on behalf of counsel for the Committee. Respondent and a character witness testified on behalf of Respondent.

Judge Pitman rejected Respondent's testimony on the key point of whether Raphael's transfer of funds was a loan to Respondent or the payment of his own funds to be held by Respondent for repayment to IGI. The Magistrate Judge found that the purported documentation of the transaction as a loan was a sham. In the words of Judge Pitman:

> The prohibitions against an attorney's misappropriating or comingling of client escrow funds are notoriously strict and well known to members of the legal profession. Fisher's putative belief— that these prohibitions could be avoided by an attorney's unilaterally labeling an escrow deposit as a personal, interest-free, unsecured demand loan—is ludicrous. No attorney could rationally harbor such belief in good faith. (R & R at 20–21; footnote omitted.)

We agree. Simply put, Respondent stole his client's money and has never repaid it. Two points raised by Respondent warrant discussion: (a) the receipt into evidence of Respondent's Affidavit of Confession of Judgment (the "Affidavit"); and (b) certain comments made at the hearing by counsel for the Committee.

*Respondent Waived His Objection to Consideration of the Affidavit Which, in Any Event, Was Properly Received.*

▮ At the hearing, Respondent objected to the admission of the Affidavit into evidence. Neither in his original objections to the Report and Recommenda-

---

**3.** We adopt Judge Pitman's convention of referring to the client by the spelling "Raphael." (R & R at 2 n. 1.)

tion nor in his nineteen-page objections to the Revised Report and Recommendation did Respondent raise any objection to Judge Pitman's consideration of the Affidavit. Instead, following the response from counsel for the Committee, Respondent submitted an unauthorized letter reply brief which raised an objection to the receipt of the Affidavit. Under Rule 72(b)(3), Fed.R.Civ.P., "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." To raise a proper objection, a party must, "[w]ithin 14 days after being served with a copy of the recommended disposition, . . . serve and file specific written objections to the proposed findings and recommendations." Rule 72(b)(2), Fed.R.Civ.P. Hence, "[t]he Court is not required to review any portion of a magistrate judge's report that is not the subject of an objection." *Adams v. N.Y. State Dep't of Educ.*, 855 F.Supp.2d 205, 206 (S.D.N.Y.2012) (citing *Thomas v. Arn*, 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)). By failing to raise an objection to the Affidavit in the manner and within the time provided by Rule 72, and instead raising it in a reply for the first time, Respondent waived the point. *See Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992) ("We have adopted the rule that failure to object timely to a report waives any further judicial review of the report."); *see also United States v. Yousef*, 327 F.3d 56, 115 (2d Cir.2003) ("We will not consider an argument raised for the first time in a reply brief.").

■ Had the evidentiary objection been timely and properly raised with the Committee, the result would be no different. Respondent objected to the admissibility of the Affidavit as evidence-in-chief on the ground that it was given as part of a settlement and barred by Rule 408, Fed. R.Evid. (Tr. 154.) The Affidavit recites that "[Raphael] gave $250,000 to me to hold in trust for the benefit of IGI for the express purpose of holding the funds for the benefit of IGI and making the Restitution Payment to IGI prior to sentencing." (Affidavit ¶ 3.) The Affidavit was sworn to before a notary and recites that the Respondent "authorize[s] the entry of Judgment in the Supreme Court of the State of New York, County of New York." (*Id.* ¶ 4.) It refers to a separate document, a "Settlement Agreement," which was not offered at the hearing. Concluding that the Respondent's sworn statement was inconsistent with his position at the hearing, the Magistrate Judge received the Affidavit as a sworn admission. (Tr. 158.) Respondent does not dispute that the Affidavit contradicts the position he took at the hearing.

Rule 408(a)(1) applies to the furnishing or acceptance of valuable consideration in compromising a claim only when evidence is offered "to prove or disprove the validity or amount of a disputed claim. . . ." Rule 408(b) expressly allows the use of such evidence if it is for a purpose not prohibited by the Rule such as "proving an effort to obstruct a criminal investigation or prosecution." We would hold that, on these facts, the admission into evidence in a lawyer disciplinary proceeding of a fully-executed affidavit, prepared for filing in state court, was proper.

Respondent's sworn statement, delivered for the purpose of possible future filing in state court, was not offered to prove the validity or amount of any civil or criminal claim against him. It was offered to prove a violation of a rule governing a lawyer's conduct, which is a fundamentally different purpose. Professional rules of conduct, enforceable by the Court, are intended to protect the public of which clients are members and preserve the integrity of the system in which lawyers

operate. While we are not aware of the issue having arisen in this Circuit in an attorney-discipline case, courts have considered evidence falling under Rule 408(a) in the context of a sanctions motion. *See Gruner + Jahr Printing & Pub. Co. v. Damian Music*, No. 00 Civ. 7156(AGS), 2001 WL 936296, at *6 n. 19 (S.D.N.Y. Aug. 16, 2001) ("[T]he reference to settlement offers or discussions in the context of the sanctions motions is not a violation of Fed.R.Evid. 408, as such evidence is not presented 'to prove liability for or invalidity of the claim or its amount.' "); *Giganti v. Gen–X Strategies, Inc.*, 222 F.R.D. 299, 313 & n. 38 (E.D.Va.2004) (collecting cases).

Moreover, Respondent's conduct was akin to one of Rule 408's non-exhaustive examples of a permissible use of evidence that would be facially barred by Rule 408, *i.e.* proving an obstruction of a criminal proceeding. Rule 408(b). The sentencing of Raphael was adjourned about 15 times between March 2008 and September 2009 and several were accompanied by oral or written representations by Respondent that Raphael was obtaining the funds in order to make restitution. (R & R at 12, *citing* Tr. 28–31.) Certain of these representations were made at a point in time that Respondent had already received $250,000 from Raphael as either a loan or a payment in trust, depending on whose version is believed. The Affidavit, together with other evidence, is an admission by Respondent that the monies were received to be held in trust by Respondent to IGI. While the principal charge that has been sustained is the misappropriation of entrusted monies, the circumstances are not unlike the example used in the text of the rule as a permissible use.

■ Alternatively, we would sustain the charges against Respondent without regard to the consideration of the Affidavit as evidence-in-chief. Rule 408(a) excludes the use of evidence barred by the rule "to impeach by a prior inconsistent statement or a contradiction." Here, Respondent's counsel expressly and repeatedly disclaimed any objection to the use of the Affidavit for the purposes of cross-examination. (*See, e.g.*, Tr. 155 ("I would not object to it being used to cross-examine Mr. Fisher when he takes the stand, as he will."); *see also id.* at 24, 154, 157, 158.) On cross-examination, counsel for the Committee referenced the Affidavit in questioning Respondent. (Tr. 407.) The Affidavit directly contradicts Respondent's account of the facts and entitled Judge Pitman to "discredit all the testimony offered by Fisher that tends to suggest that Raphael made an undocumented, interest-free, unsecured, demand loan to Fisher." (R & R at 22.) There was substantial evidence other than the Affidavit that supported the sustained charges. Thus, if it was error to consider the Affidavit as evidence-in-chief—and we conclude it was not—it neither affected the outcome of the proceeding nor any party's substantial rights; the interests of justice do not require a new hearing or modification of the R & R. Rule 61, Fed.R.Civ.P.; *see United States v. Weinlein*, 234 F.3d 1263 (2d Cir. 2000) (table decision) (holding erroneous admission of settlement evidence was harmless error); *United States v. Arias*, 431 F.3d 1327, 1339 (11th Cir.2005) (holding admission of evidence in violation of Rule 408 was harmless).

*The Comments of Counsel Did Not Prejudice the Outcome.*

Respondent objects to the R & R on the ground of unfair and prejudicial conduct by counsel for the Committee. The Committee's counsel's comments were, in the main, entirely proper argument. We conclude unanimously that in one instance (Tr.

253) its counsel's comments were not appropriate, but we are convinced that it did not affect the outcome of the proceeding before the seasoned judge. *Cf. Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d 534, 540 (2d Cir.1992) (remanding for new trial where counsel's improper appeal to regional bias during summation "cause[d] prejudice to the opposing party and unfairly influence[d] a jury's verdict"); *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981) (noting courts should consider the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction absent the improper statements).

## CONCLUSION

For the reasons discussed herein, the Revised Report and Recommendation is adopted in its entirety. In deciding the final penalty to be imposed, the Committee will consider any written submission on that subject submitted by Respondent by January 18, 2013.

SO ORDERED.

Re: IVAN FISHER

Judge Stanton partially dissents on the ground that, on the case as a whole, the evidence of a venal intent does not rise to the clear and convincing standard required to support a finding of dishonesty, fraud, deceit or manipulation, and the charged violation of N.Y. DR 1–102(a)(4) should be dismissed.

## *REVISED REPORT AND RECOMMENDATION*

PITMAN, United States Magistrate Judge:

TO THE COMMITTEE ON GRIEVANCES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK,

### I. *Introduction*

In this matter, respondent Ivan Fisher, a member of the Bar of this Court, has been charged with misappropriating client funds, failing to preserve client funds in a separate account, failing to deliver client funds to a third party as directed by a client, entering into an improper business transaction with a client, and engaging in conduct (i) involving dishonesty, (ii) that is prejudicial to the administration of justice, and (iii) that adversely reflects on the lawyer's fitness as a lawyer, in violation of DR 9–102(A), (B) and (C)(4), DR 5–104(A), and DR 1–102(A)(4), (5) and (7) of the New York Lawyer's Code of Professional Responsibility and Rules 1.15, 1.8(a), 8.4(c), (d) and (h) of the New York Rules of Professional Conduct. Respondent is alleged to have committed this conduct in connection with his representation of the defendant in the case of *United States v. Ebrahim Raphael,*[1] 04 Cr. 707(KMW) (S.D.N.Y.) ("04 Cr. 707").

By an Order dated March 13, 2012, the Committee on Grievances of the United States District Court for the Southern District of New York (the "Committee") referred this matter to me to conduct a hearing and to make findings of fact and conclusions of law concerning the charges set forth above. I held the hearing on April 17, 23, 24, and 25, 2012 and received post-hearing submissions on June 5, 2012.

On June 29, 2012, I issued a Report and Recommendation setting forth findings of fact and conclusions of law concerning respondent's alleged violations of New York's disciplinary rules. In making my findings of fact, I considered the testimony

---

1. The documentary evidence in this matter contains several different spellings of Rapha-el's surname. I use "Raphael" throughout this Report and Recommendation.

and exhibits offered at the hearing, the parties' written submissions, and a number of statements and orders contained in documents which were publicly filed in connection with *United States v. Ebrahim Raphael,* but which were not offered in evidence at the hearing. Respondent subsequently objected to my considering evidence that was not offered at the hearing and the Committee on Grievances re-referred the matter to me for further consideration.

Although I continue to believe that the Rules of Evidence permitted me to consider court filings that were not offered in evidence, *see* Fed.R.Evid. 201(b)(2); *Hayes v. Perotta,* 751 F.Supp.2d 597, 599 (S.D.N.Y.2010) (Karas, D.J.) (taking judicial notice of facts contained in court records, including transcripts and judicial opinions), upon reviewing my Report and Recommendation in light of respondent's objections, I concluded that I incorrectly based some of my findings on uncharged violations of disciplinary rules.[2] In order to avoid any issue that I had found respondent guilty of violations with which he was not charged, I have revised my findings of fact and conclusions of law. While I still consider some information from the record in *Raphael* that was not offered in evidence at the hearing, I do so only for the purposes of clarifying background information and completing the chronology of events described at the hearing. I do not consider any information from the record in *Raphael* that was not received in evidence as a predicate for finding that respondent committed disciplinary violations. *See generally Henslee v. Union Planters Nat. Bank & Trust,* 335 U.S. 595, 600, 69 S.Ct. 290, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late.").

## II. *Findings of Fact*

### A. *Facts Leading Up To and Including Raphael's Plea*

1. From 1987 through 2003, Raphael, along with his conspirator, Shace Lulgjuraj, perpetrated a scheme under which they embezzled funds from Lulgjuraj's employer, the International Gemmological Institute, Inc. ("IGI") (Hr'g Tr.[3] 19–20, 57, 61, 102–04).

2. From 2000 through January 2004, Raphael also participated in a money laundering scheme under which he provided another individual with IGI checks in return for drug proceeds (Hr'g Tr. 57).

3. In 2004, after learning that the United States Attorneys' Office for the Southern District of New York ("USAO") was investigating some of the foregoing activities, Raphael consulted with, and subsequently retained, Fisher to represent him in connection with the matter (Hr'g Tr. 20, 59–60, 106–07).

4. Prior to the events giving rise to the pending charges against him, Fisher had practiced law for more than forty years as a well-known and well-respected criminal defense attorney. Fisher handled numerous high-profile cases and enjoyed a very good reputation in the legal community (*see* Hr'g Tr. 315–21; Statement of Charges, *In re Fisher,* M–2–238, at ¶ 9,

---

**2.** Specifically, I relied on certain letters filed in *United States v. Ebrahim Raphael* and the evidence offered at the hearing to find that respondent had made factual misrepresentations to Judge Wood. Respondent was never charged with any violation of the disciplinary rules based on misrepresentations to Judge Wood.

**3.** "Hr'g Tr." refers to the transcript of the evidentiary hearing held on April 17, 23, 24, and 25, 2012.

annexed to Order to Show Cause, dated Mar. 23, 2011).

5. Fisher advised Raphael that the best course of action would be to cooperate with prosecutors before Lulgjuraj would have an opportunity to do so (Hr'g Tr. 110).

6. Raphael was indicted on July 22, 2004 and arrested on August 19, 2004 (*see* Hr'g Tr. 110; Indictment and Arrest Warrant in 04 Cr. 707, filed July 22, 2004 (Docket Items 1, 3)). Fisher entered a notice of appearance on the day of Raphael's arrest (Docket Item 5 in 04 Cr. 707) and appeared for Raphael at his initial presentment (Hr'g Tr. 110–11).

7. IGI, by its counsel Michael S. Devorkin, Esq., of Golenbock, Eiseman, Assor, Bell & Peskoe, LLP, commenced a civil action against Raphael, Lulgjuraj, and others on February 25, 2005 to recover IGI's losses (*see* Hr'g Tr. 22; *see generally* Complaint (Docket Item 1), *Int'l Gemmological Inst., Inc. v. Rafaeil*, 05 Civ. 2395(JGK)(JCF) (S.D.N.Y. Feb. 25, 2005)).

8. Despite Lulgjuraj's misrepresentations that Raphael was the organizer and principal beneficiary of the embezzlement conspiracy, through proffer sessions, negotiations, and many discussions, Fisher was able to convince prosecutors that Raphael merely assisted Lulgjuraj and had received only a very small portion of the proceeds (Hr'g Tr. 61–62, 112).

9. Raphael entered into a cooperation agreement with the USAO and pleaded guilty to one count of conspiracy to commit money laundering and one count of conspiracy to commit wire fraud in satisfaction of all charges against him (*see* Hr'g Tr. 20–21, 62; Minute Entry for Sept. 13, 2005 on Docket Report for 04 Cr. 707;). Raphael's sentencing was scheduled for January 1, 2006 before the Honorable Kimba M. Wood, United States District Judge (*see* Sentencing Scheduling Order, filed Sept. 26, 2005 (Docket Item 35), 04 Cr. 707).

10. Raphael's sentencing was adjourned to January 12, 2007 so that Raphael could assist IGI in locating the stolen funds (*see* Docket Item 49 in 04 Cr. 707); during this time, Devorkin met with Fisher and Raphael for "debriefing" sessions in order to obtain information from Raphael that could assist IGI in locating the stolen funds (Hr'g Tr. 21–22).

11. During the course of the attorney-client relation ship, Fisher and Raphael developed a close friendship (*see* Hr'g Tr. 90–92, 120, 260).

B. *Facts Regarding Transfers to Fisher*

12. In the Spring of 2007, Fisher and Devorkin entered into negotiations to settle Raphael's restitution obligation to IGI (Hr'g Tr. 22–23).

13. The USAO made it clear to Fisher and Raphael that it considered payment of restitution to IGI and assistance to IGI to be integral to Raphael's assistance to the government and crucial to Raphael's sentencing (Hr'g Tr. 329).

14. Initially, Raphael agreed that IGI would take title to his home in Great Neck, New York, sell it, and retain the proceeds which were expected to exceed $250,000 (Hr'g Tr. 22–23, 331; *see also* Order of Attachment on Consent (Docket Item 131), *Int'l Gemmological Inst., Inc. v. Rafaeil*, 05 Civ. 2395(JGK)(JCF) (S.D.N.Y. May 23, 2007) (Koeltl, D.J.)).

15. IGI and Raphael subsequently agreed that Raphael would instead pay IGI $250,000 "at or before sentencing," and, in exchange, IGI would write a "truthful letter" to Judge Wood about the extent and effect of Raphael's cooperation and restitution (Hr'g Tr. 26).

16. Raphael hoped that the letter would benefit him at sentencing, which had been rescheduled for July 2007 (*see* Hr'g Tr. 26).

17. In July 2007, shortly after reaching the agreement on restitution, Fisher impressed upon Raphael the urgency in raising the $250,000 and making payment to IGI (Hr'g Tr. 71, 126).

18. In July 2007, Raphael began to make a series of transfers to Fisher to fund Raphael's restitution payment.

19. On July 19, 2007, Raphael made a wire transfer from the bank account of S. Rafaeil Corp. to an account held by Fisher in the amount of $150,000 (*see* Comm. Ex.[4] 5).

20. On August 15, 2007, Raphael made a wire transfer from the bank account of S. Rafaeil Corp. to an account held by Ivan S. Fisher, Esq. in the amount of $74,000 (*see* Comm. Ex. 7).

21. It is undisputed that Raphael also gave Fisher an additional $26,000, most likely in cash, bringing the total amount of Raphael's funds held by Fisher to $250,000 (Hr'g Tr. 71–72, 327, 328, 340). It is also undisputed that Fisher never deposited any of the funds received from Raphael into a segregated escrow account (Hr'g Tr. 394–95, 416–17).

22. Also in July 2007, Raphael traveled to Stamford Connecticut in an effort to locate properties he believed had been purchased by Lulgjuraj's family with the proceeds of the embezzlement (Hr'g Tr. 285–86). After speaking with local police, Raphael obtained a list of about 50 properties which the police believed were connected to Lulgjuraj's family members (Hr'g Tr. 287–90). The list of properties was forwarded to Devorkin (Hr'g Tr. 27–28; Resp't Ex.[5] D).

23. On August 10, 2007, Fisher requested, and was granted, an adjournment of the sentencing, *sine die*, based on a number of reasons:

First, I have recently come into some information that may lead to the discovery of assets, perhaps of significant value, originally purchased by relatives of co-conspirator Shace Lulgjuraj. It will take some time perhaps even a few weeks to determine whether or not the information I have received can in fact lead me to these assets and their connection to the co-conspirator. Second, the defendant and the victim ... have agreed to a restitution settlement in the amount of $250,000.00. The defendant and his family who are putting together this money using the family home to secure their borrowings, are very close to their goal but have not quite reached it. Third, I have not yet received a copy of the government's 5K1.1 application which I will undoubtedly want to address in my pre-sentence submission.

(Resp't Ex. H).

24. On September 24, 2007, Fisher told Raphael that he was not holding the restitution funds in an escrow account and, to avoid any "tax problems," he needed Raphael to agree to the terms set forth in a letter from Fisher to Raphael (Hr'g Tr. 74). Although Fisher did not explain the concept of an escrow account to Raphael, to assist Fisher in avoiding any "tax problems," Raphael signed the letter and returned it to Fisher (Hr'g Tr. 74, 134–35). The letter provided:

---

**4.** "Comm. Ex." refers to the exhibits moved into evidence at the hearing by counsel appointed by the Committee.

**5.** "Resp't Ex." refers to the exhibits moved into evidence at the hearing by counsel for respondent.

I write to memorialize our agreement with regard to two loans you have made to me in the past few months, both by wire transfer. The first was in the amount of $100,000.00; the second in the amount of $150,000.00, for a total amount of $250,000.00. We agreed that these loans would be repaid upon demand and were made a no interest.

Please indicate your understanding of this letter and agreement that I have accurately stated our understanding.

(Comm. Ex. 11).

25. Devorkin researched the properties on the list obtained by Raphael and found that only a handful of the proper ties were owned by Lulgjuraj's family members (Hr'g Tr. 27–28). Devorkin also determined in the Fall and early Winter of 2007 and 2008 that it would be too expensive to attempt to prove a connection between those properties and the embezzlement proceeds, and he advised Judge Wood of this conclusion (Hr'g Tr. 27–28). Fisher also wrote to Judge Wood, claiming that the information Raphael had provided should be very useful to IGI in recapturing some of the embezzled funds (Hr'g Tr. 27–28).

26. From time to time in the Fall and Winter of 2007–2008, Raphael repeatedly asked Fisher whether he had paid the restitution funds to IGI, and Fisher repeatedly made excuses as to why he had not yet paid IGI (Hr'g Tr. 75–77). Eventually, Raphael demanded that Fisher pay IGI, and, in approximately January 2008,

Fisher, for the first time, disclosed to Raphael that he had spent a portion of the funds for his own personal expenses (Hr'g Tr. 75–77). Specifically, Fisher told Raphael that he had spent $50,000 of the restitution funds, asked Raphael to raise an additional $50,000 for IGI, and promised that he would reimburse Raphael later (Hr'g Tr. 75–77).[6]

27. Because his priority was to avoid a sentence of incarceration and in light of his belief that Fisher had done an excellent job for him, Raphael borrowed additional funds and delivered a check to Fisher, dated January 25, 2008, in the amount of $50,000, and payable to the order of IGI (Comm. Ex. 4).

28. In early 2008, Fisher delivered the $50,000 check and an additional $50,000 to IGI (Hr'g Tr. 28, 78). Fisher delivered an additional $20,000 to IGI in April 2008, leaving Fisher with an obligation to deliver $130,000 to IGI and a debt to Raphael in the amount of $50,000 (Hr'g Tr. 28–19, 78).

29. From March 2008 through September 2009, Raphael's sentencing was adjourned about 15 times; Fisher requested many of those adjournments, for various stated reasons, including medical issues[7] and commitments in other representations (see Hr'g Tr. 28–31). Several of those requests were accompanied by oral and written statements to Devorkin and the Court stating that Raphael was going to imminently, or by dates certain, obtain the funds necessary to complete payment of restitution (Hr'g Tr. 28–31).

6. Fisher conceded that he had spent Raphael's restitution funds on personal and business expenses unrelated to his representation of Raphael (Hr'g Tr. 42–24, 430, 437).

7. It is undisputed that Fisher was very ill at certain times during his representation of Raphael. Fisher testified that he was admitted to hospitals on several occasions and that he underwent spinal surgery in June 2007 to correct spinal stenosis, a bilateral hip replacement in December 2008, and an additional hip replacement in January 2009 (Hr'g Tr. 352–54). Fisher also testified that he experienced constant fatigue and back pain for several years and was taking prescription pain medication and receiving cortisone injections for extend periods of time (Hr'g Tr. 353–55).

30. On two occasions, Judge Wood ordered that the balance of the restitution be paid by dates certain but those orders were not complied with (Hr'g Tr. 29, 31).

31. In the Winter or Spring of 2009, Raphael asked James O. Druker, Esq.—an attorney who Fisher had recommended to calculate Raphael's income from the embezzlement scheme and to prepare amended tax returns—to stop by his house after work (Hr'g Tr. 138–39, 166, 168–70). That evening, Raphael told Druker that he had given Fisher $250,000 of borrowed money to pay to IGI, that Fisher had spent a lot of the money and had not fully paid IGI (Hr'g Tr. 140–41).

32. Raphael refused to allow Druker to report Fisher to the appropriate disciplinary authorities because Raphael regarded Fisher as a close personal friend and believed Fisher was the only person who could keep him out of jail (Hr'g Tr. 141).[8]

33. After Raphael's revelation to him, Druker confronted Fisher and told him that he must come up with the unpaid funds (Hr'g Tr. 141–42). Druker refused to allow Fisher to continue to adjourn the sentencing and gave Fisher a deadline to come up with the funds; when Fisher could not raise the funds, Druker was substituted for Fisher as counsel for Raphael on a *pro bono* basis on August 4, 2009 (Comm. Ex. 1; Hr'g Tr. 142–43).[9]

34. Druker gave Fisher one final deadline, insisting that he deliver the remaining funds no later than a pre-sentence hearing before Judge Wood scheduled for September 14, 2009 (Hr'g Tr. 146–50).[10] When Fisher was unable to deliver the remaining funds, Druker sent an application for reimbursement on behalf of Raphael to the Lawyers' Fund for Client Protection (Resp't Ex. C; Comm. Exs. 1A, 2–9) and a letter to the First Departmental Grievance Committee reporting Fisher (Hr'g Tr. 146–50).

35. Druker appeared before Judge Wood for the September 14, 2009 presentence hearing and, when asked by the Court about the status of the restitution payment, he disclosed what had transpired

---

8. Throughout the hearing, Raphael expressed ambivalence towards Fisher. At one point in the hearing, Raphael addressed Fisher directly and stated:

> Mr. Fisher, in my criminal case you did a magnificent job for me. I never forgot that. I love you for it. You don't need to—you don't need to convince me that you were a great lawyer. You were the greatest lawyer ever, I ever met in my life. You did a perfect job in my criminal case. Just up to the point of paying IGI, you gave it all you heart, all your days, all your nights to this case.
>
> I'm grateful to you. I always wanted to say that.... I wanted [that] to be on the record so His Honor could hear that.

(Hr'g Tr. 120).

At another point, Raphael referred to Fisher and stated: "[o]n a personal note, I really liked the guy. Then I started screaming at him and cursed him and told him if I can, I will put you in jail, you stole my money.... I cursed him, every curse I knew in English I used and I cursed him" (Hr'g Tr. 260–61).

9. Fisher also handwrote and signed a letter to Druker, on or about August 1, 2009, stating:

> James Druker Re Abe Raphael
>
> [T]he balance of the restitution still owing, $130,000 will be paid in full into your escrow account on or about the week of August 31, 2009.
>
> [T]he Defendant had made what he reasonably believed to be as a secure arrangement for the timely payment of these funds (August 5, 2009), through no fault of his own, this unfortunate delay occurred. Nevertheless, the full amount of the agreed upon restitution to IGI will have been paid on or before Sentence, now scheduled to occur on Sept. 17, 2009.

(Comm. Ex. 10).

10. Fisher conceded that he believed Druker was "trying to save [Fisher's] license" (Hr'g Tr. 406).

between Raphael and Fisher (Comm. Ex. 12; Hr'g Tr. 146–50).[11]

36. Druker arranged for Raphael's brother to send IGI an additional $30,000 and Raphael assigned to IGI his rights in the $100,000 that he requested from the Lawyers' Fund for Client Protection (Hr'g Tr. 34–35, 146–50, 181–84). Raphael also assigned all his claims against Fisher to IGI (Hr'g Tr. 34–35).

37. On January 21, 2010, Raphael was sentenced to three years probation (see Minute Entry for Jan. 21, 2010 on Docket Report for 04 Cr. 707).

38. Following Raphael's sentencing, IGI prepared to commence a civil action against Fisher but ultimately settled its claims with Fisher in December 2011 (Hr'g Tr. 37). In connection with that settlement, Fisher executed an Affidavit of Confession of Judgment in which he swore that "Raphael gave $250,000 to me to hold in trust for the benefit of IGI for the express purpose of holding the funds for the benefit of IGI and making the restitution payment to IGI prior to sentencing" (Hr'g Tr. 156). Fisher disavowed this affidavit at the hearing and testified that the above quoted passage was not true and that he "do[es'nt] have any idea" why he signed that document (Hr'g Tr. 384–85).

39. Fisher gave Devorkin post-dated checks representing his settlement payments, but informed Devorkin, before the first check ripened, that the funds would not be available [12] (Hr'g Tr. 38).[13]

### C. Fisher's Version of Events Surrounding and Following the Transfers From Raphael

40. Fisher contends that:

(a) a final agreement as to Raphael's restitution was not reached until at least January 2008 (Hr'g Tr. 332);

(b) without Fisher requesting he do so, Raphael gathered and delivered

---

**11.** Raphael testified that, following the September 14, 2009 hearing, Druker and the prosecutor had an argument over whether certain responses Raphael had given to Judge Wood had been untruthful (Hr'g Tr. 258). Specifically, the prosecutor claims that Raphael had lied before Judge Wood when he testified regarding the number of illegal transactions in which he participated. Raphael maintained that he had simply misunderstood a confusing question and that he did not intend to mislead the Court (Hr'g Tr. 231–33). Raphael testified that he was very scared after the arguments with the prosecutor and went to Fisher for help.

On cross-examination of Raphael, Fisher showed Raphael what purported to be a transcript of a surreptitiously recorded conversation between Fisher and Raphael, to refresh Raphael's recollection concerning a portion of that conversation in which Fisher told Raphael that he was "pissed off" at Raphael for saying that Fisher stole his money, to which Raphael replied that he never said such a thing (Hr'g Tr. 253–56).

Raphael testified that, at the time, he was extremely concerned about the possibility of losing his cooperation agreement with the government over what had occurred at the pre-sentencing hearing and that his priority was to "bring Mr. Fisher on board to help Mr. Druker represent [him] to keep [him] off jail" (Hr'g Tr. 258).

I accept Raphael's version of what had occurred. Raphael highly regarded Fisher's abilities as a lawyer and when confronted by Fisher, he said what he thought was necessary to retain Fisher's assistance.

**12.** Although facts regarding Fisher's conduct in connection with his settlement agreement with IGI were offered at the hearing, I do not to consider such facts as a possible predicate for a violation of the disciplinary rules because this conduct was not within the scope of conduct alleged in the Statement of Charges.

**13.** A character witness, Lawrence Gerzog Esq., testified on Fisher's behalf. However, I find that the testimony offered was not probative of Fisher's character during the relevant time period.

$250,000 to Fisher because he did not want "to have that on his mind," (Hr'g Tr. 332, 393);

(c) Fisher refused to accept the $250,000 as escrow funds because a friend had been disbarred for mishandling escrow funds and he would, therefore, only take them as a loan to himself which he could use for his own purposes (Hr'g Tr. 328, 333);

(d) Raphael loaned Fisher the $250,000 at no interest and so memorialized the transactions in a letter drafted by Fisher several weeks later (Hr'g Tr. 333–34, 341; Comm. Ex. 11);

(e) it was advantageous for Raphael to defer paying the restitution, even after it became due, because Raphael needed to ascertain the location of certain properties allegedly purchased by Lulgjuraj's family with the embezzlement proceeds (i) in order to present Judge Wood with a more solid case for a reduced sentence based on substantial assistance to the government and because (ii) recovery of substantial embezzlement proceeds would lead, through renegotiation, to a reduction of restitution that Raphael would have to pay (Hr'g Tr. 359–65, 367–68);

(f) demand by Raphael to pay IGI was only made in 2009 (Hr'g Tr. 408–10); and

(g) the claim that Fisher converted the funds, rather than borrowed the funds is untrue and was devised by Druker in order to ensure a pay-out from the Lawyers' Fund for Client Protection which would satisfy Raphael's restitution obligation without causing Raphael to need to raise a substantial amount of additional monies (Hr'g Tr. 163–64, 181–84, 194–98, 276, 376).

41. Fisher's story is internally inconsistent and I do not credit it. Raphael had transferred to Fisher almost all of the $250,000 in restitution funds by August 2007 (Comm. Exs. 5, 7). It does not make sense that Raphael would transfer this amount to Fisher six months before, according to Fisher, there was agreement as to the amount of restitution. This story is also inconsistent with Fisher's statements to the Court in Respondent's Exhibit H, dated August 10, 2007, in which he stated to Judge Wood that Raphael had agreed to pay IGI $250,000 in restitution, that he was gathering the money using his home as collateral, and that he was "very close to [his] goal" of raising the required funds.

42. There is no dispute that Raphael had to borrow the $300,000.00 he transferred to Fisher (Hr'g Tr. 73). A recurring theme in Raphael's testimony was his fear of being incarcerated and his willingness to undertake herculean efforts to avoid that possibility. It simply makes no sense that Raphael would permit Fisher to have the unfettered, unsecured, and undocumented use of funds that Raphael borrowed and which Raphael believed were critical to his avoiding incarceration (see Hr'g Tr. 306).

43. Fisher's story that he would be on safer ethical grounds by accepting the funds as an interest-free, unsecured loan instead of accepting them as escrow funds also makes no sense (see Hr'g Tr. 339). If he was, in fact, becoming Raphael's debtor, Fisher was putting himself in a position of potential conflict with his client, increasing the risk that his client—to whom he owed the highest duty of loyalty—would suffer a sentence of incarceration, and, at the very least, engaging in a business transaction that was unfair to his client in violation of DR 5–104(A). The prohibitions against an attorney's misappropriating or commingling of client escrow funds

are notoriously strict and well known to members of the legal profession.[14] Fisher's putative belief—that these prohibitions could be avoided by an attorney's unilaterally labeling an escrow deposit as a personal, interest-free, unsecured demand loan—is ludicrous. No attorney could rationally harbor such belief in good faith.

44. To the extent Fisher relies on Raphael's written acknowledgment that he had lent money to Fisher (Comm. Ex. 11), his argument is unconvincing. I conclude that Raphael signed this document as an accommodation to an individual that he then considered his lawyer, his friend, and the only person who could save him from being incarcerated (*see* Hr'g Tr. 135). I also find that similar concerns motivated Raphael's comments to Fisher in the surreptitiously recorded conversation described in footnote 11, above. Finally, I also note that Fisher had no explanation for the affidavit he signed in connection with the confession of judgment in favor of IGI in which he swore that "Ra[phael] gave $250,000 to me to hold in trust for the benefit of IGI for the express purpose of holding the funds for the benefit of IGI and making the restitution payment to IGI prior to sentencing" (Hr'g Tr. 156).

45. Based on all the foregoing factors and considering the demeanor of all the witnesses at the hearing, I find as a fact that the $250,000 transferred from Raphael to Fisher and, as described above, was transferred to Fisher to hold in escrow and to pay to IGI as restitution and that Fisher misappropriated these funds for his own personal benefit without the consent of his client. I discredit all the testimony offered by Fisher that tends to suggest

that Raphael made an undocumented, interest-free, unsecured, demand loan to Fisher.

### III. *Conclusions of Law*

■ 46. The foregoing facts establish, by clear and convincing evidence (*see* Local Civil Rule 1.5(b)), that Fisher intentionally misappropriated his client's funds, commingled his client's funds with his own personal property, failed to deliver the funds to IGI as requested by his client and as ordered to do so by the Court, and converted those funds to his own personal use. Fisher also deceived his client by lying to him about the need for a loan document and lied to his client about the status of the restitution payment. Accordingly, I make the following conclusions as to the specific charges against Fisher.

A. *Violations of Disciplinary Rules in Effect Prior to April 1, 2009*

(1) *Violations of PR 9–102(A), (B), and (C)(4)*

47. Disciplinary Rule 9–102(A) provides that a lawyer in possession of property belonging to another must not misappropriate or commingle such property with his or her own. Disciplinary Rule 9–102(B) provides that a lawyer must preserve and maintain client funds in an identifiable bank account which meets certain enumerated criteria. Disciplinary Rule 9–102(C)(4) provides that a lawyer shall promptly deliver to a client or a third party, as requested by the client or third party, property in the possession of the lawyer which the party is entitled to receive.

---

**14.** In fact, attorneys admitted in the First or Second Judicial Departments must affirm, in the biennial Attorney Registration Form, that they "have read, and [are] in compliance with, Part 1200 (Rule 1.15) of the Joint Rules of the Appellate Divisions, governing the conduct of attorneys, which requires an attorney to preserve the identity of funds and property entrusted to him" (*see* 22 NYCRR §§ 603.15, 691.12).

48. As the Appellate Division, Fourth Department stated in *LaCava v. N.Y. State Bar Assoc.*, 53 A.D.2d 204, 205–06, 385 N.Y.S.2d 642, 643 (4th Dep't 1976):

> An attorney holds money that he collects for a client as a trustee and he is obligated to keep it separate from his own and pay it over to the client on demand. If he fails to do so and uses the client's money for any purpose of his own, he violates his professional duty and should be disciplined (*Matter of Braun*, 11 A.D.2d 147, 204 N.Y.S.2d 194; *Matter of Babcock*, 230 App.Div. 323, 325, 243 N.Y.S. 489). It is no defense that the attorney intended to and did, in fact, reimburse the client (*Matter of Detsky*, 16 A.D.2d 595, 229 N.Y.S.2d 869; *Matter of Coleman*, 178 App.Div. 580, 583, 165 N.Y.S. 685). The conversion is complete when the account in which the client's funds are deposited is overdrawn or when the balance of the account is less than the client's interest in it, and the conduct of the attorney is not excused because the improper handling of the funds is due to mismanagement rather than misconduct (*Matter of Le Pore*, 39 A.D.2d 261, 334 N.Y.S.2d 102; *Matter of Raines*, 38 A.D.2d 459, 330 N.Y.S.2d 669).

[*Matter of Iversen*, (51 A.D.2d 422, 423–24, 381 N.Y.S.2d 711, 713).] Nor may an act of conversion be thereafter transformed into a loan by the fact that a note was subsequently given to the client (*Matter of O'Doherty*, 14 A.D.2d 4, 9, 217 N.Y.S.2d 961, aff'd 11 N.Y.2d 1028, 230 N.Y.S.2d 26, 183 N.E.2d 909; *Matter of Rinaldi*, 265 App.Div. 715, 717, 40 N.Y.S.2d 571; *Matter of Schwalb*, 262 App.Div. 482, 483, 30 N.Y.S.2d 513; *Matter of Getz*, 256 App. Div. 194, 195, 9 N.Y.S.2d 462).

49. Here, Fisher intentionally misappropriated his client's funds, commingled his client's funds with his own personal property, failed to deliver them to IGI as requested by his client, and converted those funds to his own personal use. By virtue of this conduct, as set forth in paragraphs 19, 20, 21, 24, 26, 28 and footnote 6 above, Fisher violated Disciplinary Rules 9–102(A), (B), and (C)(4).

### (2) *Violation of PR 5–104(A)*

50. Disciplinary Rule 5–104(A) provides that a lawyer shall not enter into a business transaction with a client unless the transaction and terms are fair and reasonable to the client and fully disclosed in writing, the lawyer advises the client to seek independent counsel in the transaction, and the client consents in writing, after full disclosure, to the terms and to the lawyer's inherent conflict of interest in the transaction.

■ 51. I conclude that Fisher did not violate DR 5–104(A). A business transaction, by its inherent nature, is a consensual transaction. Because I find that Fisher misappropriated Raphael's funds without Raphael's knowledge or consent, Fisher's taking cannot fairly be characterized as a business transaction.

### (3) *Violations of PR 1–102(A)(4), (5), and (7)*

52. Disciplinary Rule 1–102(A)(4) provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. Disciplinary Rule 1–102(A)(5) provides that a lawyer shall not engage in conduct that is prejudicial to the administration of justice. Disciplinary Rule 1–102(A)(7) provides that a lawyer shall not engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer.

53. Fisher intentionally misappropriated his client's funds, commingled his client's funds with his own personal property, failed to deliver the client's funds to IGI as requested by his client and as ordered to do by the Court, converted those funds to his own personal use, deceived his client by lying to him about the need for a loan document, and lied to his client about the status of the restitution payment. By virtue of this conduct, as set forth in paragraphs 19, 20, 21, 24, 26, 28, 30 and footnote 6 above, Fisher violated Disciplinary Rules 1–102(A)(4), (5), and (7).

### B. *Violations of Rules of Professional Conduct in Effect As of April 1, 2009*

54. Because Fisher was a member of the bar of New York State during the time period at issue, "the New York State Code of Professional Responsibility ... applies to conduct through April 1, 2009, and the Rules of Professional [Conduct], which took effect on April I, 2009, apply to his conduct on or after that date." *In re Vialet*, 460 Fed.Appx. 30, 38 (2d Cir.2012).

55. Rule of Professional Conduct 1.15 prohibits the commingling and misappropriating of client funds and requires a lawyer to preserve client funds in a separate account and to deliver client funds as directed by his client. Rule of Professional Conduct 1.8(a) prohibits an attorney from entering into a business transaction with a client unless certain requirements are met. Rule of Professional Conduct 8.4(c), and (d) prohibit an attorney from engaging in conduct involving dishonesty or that is prejudicial to the administration of justice. Rule of Professional Conduct 8.4(h) provides that a lawyer shall not engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer.

56. Because Fisher's conduct which implicates Rules of Professional Conduct 1.15, 1.8(a), and 8.4(c), (d), and (h) occurred prior to April 1, 2009, I conclude that there is insufficient evidence to find that Fisher violated these Rules.

### IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that Fisher violated 9–102(A), (B), and (C)(4) and 1–102(A)(4), (5), and (7) of the New York Code of Professional Responsibility. I further find that, based on the dates on which Fisher's conduct occurred, Fisher did not violate 5–104(A) of the New York Code of Professional Responsibility, and 1.15, 1.8(a), and 8.4(c), (d), and (h) of the New York Rules of Professional Conduct.

### V. *Objections*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6(a) and 6(d). Such objections (and responses thereto) shall be filed with the Committee on Grievances of the United States District Court for the Southern District of New York, in care of the Honorable P. Kevin Castel, United States District Judge, 500 Pearl Street, Room 2260, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Rakoff. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992);

*Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.1983).

August 23, 2013.